## Hensley v. Commonwealth.

(Decided December 4, 1931.)

H. F. PRICE and MARTIN & SMITH for appellant.

J. W. CAMMACK, Attorney General, and HOWARD SMITH GENTRY for appellee.

Opinion of the Court by Drury, Commissioner—Reversing.

About 9 p. m., May 21, 1929, Angie Hensley shot and killed her husband, George Hensley. Upon her trial, which began on September 10, 1930, under an indictment charging her with murder, her claim of self-defense was rejected by the jury, she was found guilty of manslaughter, her punishment was fixed at five years in the penitentiary, and, the court having overruled her motion for a new trial, she has appealed. As one of her grounds for reversal is a claim that this verdict is flagrantly against the evidence, we shall state the evidence briefly.

It shows that these parties had been married just six weeks. They had lived together in peace, according to Mrs. Hensley, until the day of the shooting. The evidence for the commonwealth and that for the defendant cannot be reconciled. The commonwealth showed that Mrs. Hensley had tired of her husband, that she felt she had no ground for divorce, and in her anxiety to rid herself of him and to get the insurance on his life, which she thought he had, she proposed to the witness Wm. Smiley, Jr., so he says, to give him $250 and one-half of what she got out of this insurance if he would kill her husband. The witness did not accept this oft-repeated proposition, and Mrs. Hensley said she would kill him herself, but was afraid, if she did so, she could not collect this insurance. It was the theory of the commonwealth that she killed her husband to get this insurance and to rid herself of him, in order that she might be free to bestow her favors upon another man, who soon after this homicide became a member of her household, ostensively as a boarder.

The commonwealth showed by Wm. Smiley, Jr., that this shooting occurred in the house at a time when all was apparently peaceful, without warning or previous altercation; that her husband was seated on a davenette; that she shot him as he was in the act of arising; and that some one caught him and eased him down upon the davenette again. It showed by Dr. Richardson, the coroner, that the ball entered her husband's left side above the hip, passed out his left leg near his crotch, then entered his right leg, in which it severed a blood vessel of such size that he bled to death in a short time without ever saying a word, so far as this record discloses. Wm. Smiley, Jr., testifies that Mrs. Hensley then placed a pistol near the right hand of the dying man and directed those present to leave it there, and, when it was suggested that a doctor be called, that she said: ''Well, I will wait until he gets a damn good bleeding and then I will call 'em after he gets too weak to talk any.''

For Mrs. Hensley it was shown that her husband came home in the early evening in a towering rage, apparently under the influence of liquor or dope; that he tried to start a difficulty with his wife; that he refused to eat any dinner, and left, saying he was going to his mother's to get his big pistol and would then ''come back and kill the whole damn bunch.'' The household was alarmed, and the members thereof telephoned his mother to keep him there and to disarm him. A few minutes before 9 o'clock her husband returned, went out on the back porch where a workman was making some repairs, talked to him for a few moments, then the workman left, and her husband came in and renewed the quarrel. Soon an active fight was in progress between Mrs. Hensley and her daughter by a former marriage on one side, and her husband on the other, while another female member of the household, unrelated to any of them, fled for safety and to procure assistance. The husband got the better of the fight, whereupon Mrs. Hensley, having got her pistol, fled to the front porch, while a young man, a suitor of her daughter, entered the brawl. The husband struck this young man over the head with a pistol, and soon freed himself of him, thereupon he turned his pistol upon Mrs. Hensley, whereupon she shot him through the half-opened screen door, and he walked back into the house, sat down on a davenette, let his pistol fall on the floor, and bled to death while she was frantically tele-

phoning for a doctor. In support of her story, the defendant points to the hole in the screen door (made as she says by the fatal bullet) and to some spots of blood on the step of the front porch, while the commonwealth attacks this story as untrue, because of entire lack of evidence of cuts, bruises, broken fruniture, or other indications of a struggle, and it accounts for the blood spots on the step of the porch by the fact that the bleeding, bloody, dying man was carried across the porch on the way to the hospital. This account of the blood on the porch step is in harmony with the evidence, as no witness says the victim was on or about the step. It also seems highly improbable that the defendant could have shot her husband under the circumstances shown by the witnesses for her and have inflicted upon him the wound she did. The range of the fatal bullet indicated it as fired while she was above her husband and he was in the act of rising.

It cannot be said that this verdict is without support in the evidence or is flagrantly against the evidence as now presented. When Mrs. Hensley admitted she slew her husband, it then became incumbent on her to justify or excuse her act. See Simmons v. Com., 207 Ky. 570, 269 S. W. 732.

The witness Donald Miles, who went over just after the shooting, did not then see the hole in the screen door. No witness for the commonwealth, or the defendant, says he saw any hole in the screen door until the next morning. The jury saw these witnesses and heard them testify. They heard witness after witness testify that Mrs. Hensley's moral reputation was bad.

### Appeal of Attorney to Passion and Prejudice.

A vigorous attack is made upon the things said by the attorney for the commonwealth in his closing argument to the jury, and that argument, in full, together with the objections and the rulings of the court thereon, is in this record, but, as the alleged misconduct of the commonwealth's attorney was not made a ground for a new trial, we cannot consider it.

### Rulings on the Evidence.

Mrs. Hensley testified that some time before this homicide, her husband and Sam Searce had been fined

for bootlegging, that on the day of the shooting Searce had come to her home and claimed he had paid the fines of both of them, and he wanted to see her husband to get him to pay the fine which Searce claimed he had paid for him. The court refused to allow her to go into the conversation with Searce any further, and she avowed that she told Searce she had given her husband the money to pay him, that Searce saw her husband later at a pool room in Catlettsburg, and told him that, whereupon he became angry and a brawl ensued in which he threatened to kill Searce. The court refused to allow her to detail this pool room conversation. This was properly excluded. Mrs. Hensley was not present in the pool room, and whatever she might know of that brawl is hearsay, and her conversation with Searce was not admissible.

The principal witness against Mrs. Hensley was William Smiley, Jr., who was then under a death sentence for the murder of Joe Deskins, which was done on July 7, 1929. See Smiley v. Commonwealth, 235 Ky. 735, 32 S. W. (2d) 51. Mrs. Hensley had been a witness against Smiley on that trial, and she was allowed to show that, but the court properly refused to allow her to state the details of her testimony on that trial. The case against Smiley was not being tried by this jury. It was proper to allow her to show she had testified against Smiley, but not to go into the details of her evidence. Moreover, the defense in the cross-examination of Wm. Smiley, Jr., had drawn out of him just what had been the evidence of Mrs. Hensley on that trial.

### Newly Discovered Evidence.

Mrs. Hensley offers, if given a new trial, to show by Theodore Puckett and his wife, whose affidavits she files, that they saw Wm. Smiley, Jr., at Kenova, W. Va., about 9 p. m. on the night of the shooting, but these same witnesses show in affidavits they made for the commonwealth they were at their home near the Hensley home at the time of the shooting, and that Smiley had plenty of time after they saw him in West Virginia to reach the Hensley home by the time of the shooting; hence their evidence about seeing him in West Virginia amounts to nothing.

She says she can now show by Mr. Pearl Howell, whose affidavit she files, that after the conviction of Wm. Smiley, Jr., he visited Smiley in the jail, and then remarked to him that he would probably be kept in jail there for use as a witness against Mrs. Hensley, and that Smiley said he was not present when Mrs. Hensley shot her husband, and he knew nothing about it. She offered to show by Clyde Hatfield that young Smiley had made a similar statement to him. She also filed an affidavit signed by Howard Grubb and Hiram Dorton in which they say they had a conversation with Wm. Smiley, Sr. (one of the witnesses against Mrs. Hensley), relative to the conviction of his son, and relative to the approaching trial of Mrs. Hensley in which the elder Smiley said he did not know anything about the Hensley case, but that she was the worst witness against his son, and he was going to put her in the same place his son was.

The defense had showed on this trial by several witnesses that neither of the Smileys was at the Hensley home on the evening of the killing. Wm. Smiley, Jr., was the only witness introduced by the commonwealth who claimed to have seen this shooting, and Wm. Smiley, Sr., was the only other witness introduced who claimed to have been near to the shooting. Indeed, but four witnesses were introduced by it in chief. One was the mother of the deceased, who testified to his age and to a few other minor facts. Another was the coroner, who testified to the nature of his wounds; and the other two witnesses were the Smileys.

The testimony of Wm. Smiley, Jr., is that he had gone to Mrs. Hensley's home for the purpose of selling her some bottles to be used by her in bottling some homebrew she had, and that just as he stepped in the front door Mrs. Hensley entered the room from the rear, walked up to her husband, and shot him as he was in the act of arising from the davenette on which he was seated. The elder Smiley says it was his son Tom who entered the front door just before the shot was fired. He was asked where Tom was at the time he so testified, and he stated that he was there in the court room. Tom was not called as a witness. Thus the two Smileys do not agree in their testimony. Wm. Smiley, Jr., says he was there and saw the shooting, he is the only witness for

the commonwealth that testifies how it occurred, and he is the only witness who says he was there. Seven other witnesses say he was not there. His father does not say he was there. By these newly found witnesses Mrs. Hensley proposes to show that he told them he was not there. No witness on the trial testified to anything that young Smiley had previously said on the subject. Hence, this evidence is not strictly cumulative. Of course, it is impeaching, but it tends to impeach the commonwealth's sole witness to the homicide, and whose account of it is at variance with the account given by all the other eye-witnesses.

Ordinarily a new trial will not be granted for newly discovered evidence that is only impeaching in its nature, but there are exceptions to this rule, and it should be cautiously applied where it affects the evidence of the sole witness upon whose testimony the conviction was necesarily had and when the discovered evidence is of such a nature that, unexplained, it would probably have induced the jury to reach a different conclusion.

The newly discovered evidence affecting the testimony of Wm. Smiley, Sr., tends to show his bias and his feeling as to Mrs. Hensley, but his testimony was not important, and if his were the only testimony to be affected it would probably not be sufficient, but taking together the new evidence affecting the testimony of both of these men, we conclude that it is sufficient to warrant the granting of a new trial. See Divine v. Com., 228 Ky. 257, 14 S. W. (2d) 767; Brewer v. Com., 228 Ky. 128, 14 S. W. (2d) 375; Tyree v. Com., 160 Ky. 706, 170 S. W. 33; 20 R. C. L., p. 294, sec. 76, note 5; 16 C. J., p. 1205, sec. 2729, note 87.

Judgment reversed.

The whole court sitting.