## Jeter v. Commonwealth.

(Decided April 23, 1937.)

H. H. LOVETT for appellant.

HUBERT MEREDITH, Attorney General, and JOHN M. CAMPBELL, Assistant Attorney General, for the Commonwealth.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

The appellant, Charles Jeter, upon trial on an indictment charging him with the murder of Lisher Darnell, Jr., was convicted of voluntary manslaughter and his punishment fixed at 7 years' imprisonment.

From the judgment entered upon this verdict, he appeals, insisting as grounds for its reversal: (1) That the jury was wrongfully impaneled; (2) that the court erred in overruling his motion for a continuance, because of the absence of material witnesses; and (3) for the court's prejudicial error in unreasonably limiting the time for argument to 30 minutes to the side.

Practically all of the parties here involved as principals and witnesses to this unfortunate tragedy in evidence were neighborhood boys who had grown up together as friends and companions in the neighborhood of Glade, Marshall county, Ky.

The appellant, Charley Jeter, was 19 years of age at the time of his admitted cutting and killing of the deceased, Lisher Darnell, Jr. (referred to in the record as Junior), who was then 17 years of age.

It is disclosed by the record that on the Sunday afternoon, about sundown, of January 5, 1936, the appellant and deceased, the latter's younger brother, Reginald, and a friend, Will Hayes, had all been visiting at

the home of their neighbor and friend, Doc Holley, which they all left together, going the same way, for their homes; that, after they had thus proceeded down the road as far as the home of Bill Smith, Will Hayes there turned off to his own home, after which the remaining three proceeded on their way to the Darnell home, about a half mile distant therefrom, young Reginald walking some 30 or 35 steps in front of his brother and the appellant, who followed, walking together; that when they had thus walked to within about one hundred yards of the Darnell home, as testified to by Reginald, his attention was attracted to some trouble arising between his brother and Charley by hearing the latter call his brother a "s. o. b.;" that he then turned and walked back near them, when he saw his brother, Junior, staggering about the road with his throat cut, who told him that "Charley had killed him" and then fell across the ditch by the roadside, mortally wounded.

Reginald testifies that he did not see how the trouble arose between his brother and the appellant, or who was the aggressor therein, as he was at the time some distance in front and looking ahead, but that when he went back near them, he saw a knife blade flash in the hand of the appellant but did not see any knife in the hand of his brother; that he at once, upon seeing what had occurred, ran to his home, about a hundred yards ahead, and told his daddy of Junior's dying condition, when they at once rushed back to him, meeting, as they went, the appellant coming up the road towards their house, who began to tell his father about his trouble with Junior and offered to and did help them to bring the dead body of Junior to his home; that when they reached Junior's side, he "breathed but one breath" before he died there in the roadside ditch; that, when they lifted and carried him therefrom, as testified to by both Reginald and his father, they did not find or see any knife under or about him, though appellant testifies that he did see Junior's knife lying under his body at such time.

The father's testimony is in substance the same as Reginald's as to their meeting the appellant as they ran up the road to the aid of Junior, as to Charley's then undertaking to tell him of his having just killed his son and as to his turning and going back with them to where they found Junior, lying in the ditch dying; that Charley helped them lift and carry him to his home, after which

he told Charley to "leave the house and go home and tell his daddy what he had done," but that he did not in any way, with his gun or otherwise, threaten to hurt him.

Also, Junior's mother testifies that the defendant, in talking to her about her son, told her at this time to "stop bawling," that he had not hurt "her little Junior."

Further witnesses for the Commonwealth, Prentice Phillips and Charles Cope, testify that 4 or 5 days after Junior was killed, they, together with Reginald and his father, Mr. Darnell, were hunting around for Junior's lost knife; that they first looked around about the roadside ditch, from where they had removed Junior's body, but did not find it; that they then got some hoes and "drug along where the cars had been" in the mud of the road, where Phillips dug up and there found the knife buried in the mud with its blades closed, about 5 steps from where the cars turned into the yard of the Darnell home or some hundred yards distant from where Junior was stabbed and killed by appellant.

The evidence is further that after the appellant, Jeter, was told to leave and left the Darnell home, he went first to his home, where he spent a few minutes with his parents, and then proceeded to go to the home of a Mr. Brown, where, the Browns testify, he attempted, but failed, to borrow a dollar from them, after which he walked to the rather distant home of a cousin, Mr. Moore, where he arrived about midnight and spent the night, after which from there he went to the home of an aunt, who lived in the far end of the county, where he told them of the trouble he was in and stayed until he was apprehended and arrested by the officers.

The appellant, when testifying in his own behalf, gave practically the same account of their visit to the home of Doc Holley upon this Sunday afternoon in evidence as was given by Reginald Darnell, but adds that shortly before they left the Holley home, he suggested to the crowd, or to Will Hays and L. D. Holley, that they go over that night "to Oscar's" (a neighbor and friend) and play a game called "owl," and that as they left Doc Holley's house, he whispered in L. D.'s (Holley's) ear that he would come back in a little while for him and go over to Oscar's. The appellant further testifies that his whispering this to L. D. appeared to have angered or "peeved" Junior, as is also testified by Mrs.

Holley, a witness for the defendant, who states that Junior at the time it was done asked her if she had heard what Charley had whispered to L. D., to which she had answered that she hadn't, but for him not to pay any attention to them as Charley "was green," to which Junior had replied, "I will see him later."

Further, the appellant testifies that, after the four of them had together left Holley's house and were on the way to their homes, and after his friend, Will Hayes, had turned off and left them at Bill Smith's, Junior had said to him, "Charley, what did you whisper in L. D.'s ear?" to which he answered, "What do you want to know for?" when Junior then said, "You don't know how much I want to know, you g. d. s. o. b.," to which appellant replied, "It is none of your business what I whispered in L. D.'s ear;" that Junior then pulled out his knife, when he (the appellant) said, "Junior, I don't want to have any trouble with you. I always liked you and I don't want to have any trouble with you;" that they went along about 15 steps, when Junior said, "You are a g. d. s. o. b. if you don't call me one," to which he in turn answered, "You are a s. o. b.," whereupon Junior started at him with his knife, striking at him with it and slightly cutting him on his neck; that he then got out his knife and, in further describing their fatal fight, states that "whenever he struck at me with his knife, I jumped back and I reached in my pocket and got my knife out and I held him off with one hand, like this, and I cut him. Twice, I think;" that he did this, he testifies, only after he was attacked by Junior and in his self-defense, when he thought Junior was going to kill him.

It is to be noted that the facts and circumstances as to how this fatal difficulty arose between these boys, or as to who was the aggressor therein, is not testified to by any one except the appellant, who testifies as the only living eyewitness thereto and in a way that represents the deceased as having been the aggressor in bringing on the fight resulting in his death.

Young Reginald, the chief Commonwealth witness as to the killing, says that he did not see the beginning of this difficulty, for the reason that his attention was called to it only after his brother had been fatally stabbed by appellant, when, upon turning and going back,

he did see a knife in the hand of appellant but none in the hand of his brother.

It is the appellant's contention and theory of defense that Junior was in fact the aggressor and attacked him with his knife, after calling him a "s. o. b." and before he had done anything to him; that he saw Junior's knife lying under his body as they lifted and carried him to the house and, for such reason, contends that the knife was taken from such place by some of Junior's family and planted in the road in front of the house for the purpose of making it appear that Junior could not have been the aggressor in the fight by attacking him with his knife, for the reason that Phillip's later finding Junior's knife at a place distant from where the fight occurred showed that he there had no knife with which to attack the appellant.

The appellant having been at the March term of the Marshall circuit court indicted for the murder of the deceased, the case was assigned for trial upon a later day of the same term of court (without objection, it appears, or motion made for a postponement of the trial with a view to having adequate time for preparing appellant's defense).

Upon the call of the case for trial, appellant by counsel objected to the jury as having by the court been wrongfully impaneled.

The record discloses as to this that the jury was first called from the regular panel of 24 jurors, which was exhausted with only 4 jurors accepted therefrom; that the defendant then moved the court to draw from the jury drum a sufficient number of names to complete the jury, which was thereupon done, the court drawing 9 names from the wheel, which exhausted all the names then therein; that of these 9 so drawn from the drum, 7 appeared in obedience to summons, only 3 of whom qualified as jurors; that the court then, upon its own motion "directed the sheriff to go into the county into a place remote from the scene of the killing and summon fifty jurors to report for service and suggested to the sheriff that he go in and about Oaklevel (a community on the west side of the county), to all of which the defendant excepted."

We are unable to concur with the contention of ap-

pellant that the court's procedure here followed in drawing this trial jury was properly subject to the criticism of being irregular, or wrongful, or a departure from or in violation of the procedure prescribed therefor by section 2247, Kentucky Statutes, which in part provides that:

> "If, in any criminal or penal cause or proceeding called for trial, the panel shall be exhausted by challenge, the judge may supply such jurors by drawing from the drum or wheel case, or may direct the sheriff to summon for the trial of that cause any number of bystanders or persons to fill such vacancies."

Here it is shown that the regular panel was first exhausted; that then, upon defendant's motion, the names in the jury drum were all drawn therefrom in open court (only 3 of whom qualified); and that thereupon the court directed the sheriff to summon some 50 other persons from a part of the county remote from where the tragedy occurred. We discover in these steps taken in impaneling the jury no departure from or disregard of the procedural directions prescribed by the statute quoted.

Some contention is made by appellant that the sheriff's execution of this direction of the court to summon for jury duty 50 other persons was improper, in that he summoned many persons from the eastern part of the county, where, he contends, the killing occurred and many of the decedent's family lived, rather than from the western side of the county. However, it is sufficient answer to this to say that these claims were by the court amply answered by the counter affidavits of county officials, purporting to show that the summoning of these jurors was properly carried out by the sheriff, in that they were selected from parts of the county distant from the place or part thereof where the killing occurred, and that there was no collusion or connivance on the part of any of the county officials, due to political or any improper consideration, to summon as jurors those who would be hostile to the accused because of the political prominence of decedent's family.

Counsel for the Commonwealth insists that whatever was done was not subject to exceptions, because of the provisions of section 281 of the Criminal Code of

Practice as by the 1910 Act amended (chapter 92), citing in support thereof many cases so holding. However, it is enough to say, in answer to this, that the holding in the cited cases was based upon this section of the Criminal Code before its later amendment by the Act of 1932 (chapter 63), providing by secton 2 thereof that said section 281 of the Criminal Code of Practice should be amended and re-enacted so as to provide that "the decision of the court upon challenges, and for cause, or upon motions to set aside the indictment, shall be subject to exception. Taylor v. Commonwealth, 265 Ky. 553, 97 S. W. (2d) 417; Alsept v. Commonwealth, 245 Ky. 741, 54 S. W. (2d) 337.

However, even treating section 281 as now so amended and as now permitting exceptions to the decision of the court upon challenges and for cause and to set aside the indictment, we are yet fully convinced that the exceptions here urged are without merit and represent no departure from a proper impaneling of the jury as prescribed by the statute.

Further, the appellant contends that upon the call of the case for trial, the court erred in overruling his motion to grant him a continuance thereof, upon the grounds set out in the supporting affidavit, that he was not then ready for trial for the reason that certain witnesses whose evidence was very material for his defense, to wit, Ethel Dayton, Gentry Smith, and George Irwin, resided in the city of Detroit and that for such reason he had been unable to procure their attendance at that term, but whose presence he believed he could procure; that they would testify that they had heard the Commonwealth's witnesses, Prentice Phillips and Charley Cope, state that they, decedent's family, had found Junior's knife under his body and picked it up and "planted" it at a place where it was said to have been found and later pretended to find it. Appellant contends that this evidence was not only very important, as tending to corroborate appellant's theory of having been attacked by the decedent and his killing him in his self-defense, but as also tending to contradict and impeach the testimony of the Commonwealth witnesses, Phillips and Cope, that Junior's knife was found at a place distant from that where he was killed. While the court refused to continue the case upon this ground, it yet did so upon terms of giving the defendant the advantage of letting this impeaching

evidence go to the jury, by permitting their affidavits to be read as the depositions of the absent nonresident witnesses. It would appear that such ruling of the court upon the motion for continuance properly conformed with section 189 of the Criminal Code of Practice, providing that:

> "Whenever, in any criminal or penal action pending in any of the courts of this Commonwealth, an application shall be made by the defendant for a continuance, based upon affidavits stating the absence of one or more material witnesses, and the facts which such absent witness or witnesses would, if present, prove, the attorney for the Commonwealth shall not be compelled, in order to prevent a continuance, to admit the truth of the matter which it is alleged in the affidavit such absent witness or witnesses would prove, but only that such absent witness or witnesses would, if present, testify as alleged in the affidavit. In which event the defendant may, on the trial, read such affidavit as the deposition of such absent witness or witnesses, subject, however, to exception for irrelevancy or incompetency; and the attorney for the Commonwealth shall be permitted to controvert the statement of such affidavit so read by other evidence, and to impeach such absent witness or witnesses to the same extent as if he were personally present."

Upon the trial, the matter as set up in the affidavits was read to the jury as the depositions of the absent witnesses, and this evidenc was contradicted, as is also by the quoted section of the Code provided, by the Commonwealth witnesses, Phillips and Cope, who denied ever having made such statements, set out in the affidavits, in the presence of the said witnesses now in Detroit, or at all, as to Junior's knife having been found in the ditch under his body, but afterwards "planted" in the road near his house, where it was pretended to have been found by them.

The general rule applicable and controlling in such instance is, that the decision of such question rests within the sound discretion of the trial court and that its discretion is abused only where established rules of practice and defendant's fundamental rights are disregarded. Hudson v. Commonwealth, 220 Ky. 582, 295 S. W. 886;

Jamerson v. Commonwealth, 230 Ky. 704, 20 S. W. (2d) 711.

Also, as to this it was stated in Bowling v. Commonwealth, 148 Ky. 9, 145 S. W. 1126, where all the witnesses who were present at the killing appeared and testified and the object sought in securing these further witnesses was only to impeach the testimony of the witnesses who testified, and the court gave to the defendant the benefit of such impeaching evidence, by permitting the affidavit to be read as the depositions of the absent witnesses, that the court's refusal to continue was not prejudicial.

Also see Tipton v. Commonwealth, 207 Ky. 685, 689, 269 S. W. 1007; Howard v. Commonwealth, 192 Ky. 687, 234 S. W. 299; Kennedy v. Commonwealth, 78 Ky 447; White v. Commonwealth, 80 Ky. 480, and 20 R. C. L. section 76, page 294, where this rule was well stated as follows:

> "If, from the nature of the evidence that the moving party seeks to rely upon, as disclosed by the motion and affidavits, it is apparent no purpose can be served other than the impeachment of the testimony of an adversary, or a witness of the adverse party, a new trial should not be granted, unless the testimony of the witness sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing, that a different result must necessarily follow. The rule applies in criminal cases where the only tendency of the newly discovered evidence is to impeach or discredit the prosecuting witness, or other witnesses for the state, or to impeach the dying declarations of a deceased person."

Appellant also, in his motion and grounds for a new trial, and as a supplemental ground thereto, relied upon his alleged discovery of new evidence in that, since the trial, he had been reliably informed, as set out in his affidavit, that the nonresident Will Hayes would testify, if a witness, that within 30 minutes after the fatal difficulty between the appellant and deceased, its occurrence was told and described to him by Reginald Darnell, the Commonwealth's main witness and younger brother of Junior, who then had told him that he had seen the whole fight and that the way it came about was that Junior, the decedent, had asked the defendant what he had whis-

pered to Holley, who answered that it was none of his "damn" business, when the decedent then called the defendant a "s. o. b.," who also called him one; that the decedent then started on the defendant with a knife, when he then cut and killed the decedent.

While this alleged newly discovered evidence tended to corroborate the defendant's testimony and to support his theory that he killed Junior in self-defense when attacked by him, and also tended to impeach and rebut the evidence of Reginald Darnell, who testified as the main Commonwealth witness to the effect that, although he did not see how the trouble arose between the decedent and appellant, or who was the aggressor therein, he yet then and there saw them just after Junior had been stabbed by appellant and that he at such time saw no knife in his brother's hands, when he was near and looking at him, as a general rule newly discovered evidence, as to contradictory statements made by a witness, either at or after the trial, is not a ground for a new trial, in that testimony of this character is but another mode of impeaching a witness. See 20 R. C. L. p. 295, and note to such effect in Ann. Cas. 1912D, page 857.

Such being clearly the character of the alleged newly discovered evidence of Hayes, and such evidence falling short of being convincing, or as promising a different result in the finding of the jury if submitted, in that it is only contradictory of the Commonwealth's evidence as tending to impeach the testimony of its witnesses, who testified that Junior was at the time he was killed without a knife and was not therefore the aggressor in the fight, it is our conclusion that the court did not err in also overruling this ground for a new trial, even though mindful of the limitation upon the rule that when such impeaching evidence "seriously affects the testimony of the sole or all of the principal witnesses upon whose testimony it is manifest the conviction was had, and it is reasonably certain that had the evidence been heard, it would probably have induced a different conclusion by the jury, the recognized exception to the rule—always to be administered with caution—becomes operative." Shepherd v. Commonwealth, 267 Ky. 195, 101 S. W. (2d) 918, 920; Hensley v. Commonwealth, 241 Ky. 367, 43 S. W. (2d) 996; Elkins v. Commonwealth, 245 Ky. 199, 53 S. W. (2d) 358.

Appellant's final ground assigned for a reversal of

the judgment is that the court erred in limiting the argument of the case by each side to 30 minutes.

It is to be noted that the material evidence was very short, the number of witnesses who attempted to tesify as to the material facts being very few, and it is manifest that but a short period of time was required to thoroughly present and argue it before the jury. How much time was required for this was also a matter resting within the sound discretion of the court. The applicable rule in such case is well stated in Teague v. Commonwealth, 172 Ky. 665, 189 S. W. 908, 911, L. R. A. 1917B, 738, where we said:

"It is at once apparent that the time that should be allowed for the argument of cases cannot be regulated by a rule fixing the time that should be allowed in any particular case, because every case presents different facts and circumstances, and so, although we have in some cases held that the time allowed for argument was not sufficient and in other cases held that it was, we have adopted the practice of leaving it to the trial judge to regulate, in the exercise of a sound discretion, the time for argument in each case, and it is only when it plainly appears that this discretion has been abused to the prejudice of the substantial rights of the defendant that his refusal to allow a longer time will be deemed reversible error."

Here appellant's stabbing and killing of the deceased, Junior Darnell, has been established and admitted by him, making it incumbent upon him to justify or excuse his act by evidence showing that it was done in his necessary self-defense.

He testifies it was so done, and he is the only witness who testified as to an assault made upon him by the deceased, tending to excuse his act as one done in self-defense. The only contradictory evidence is that of the decedent's younger brother, who testifies that he saw no knife in his brother's hands at the time he told him that the appellant had killed him. The evidence is too brief upon this issue, and the witnesses who testified to it too few in number to require a longer time than was here allowed for a full and fair presentation and argument of it to the jury.

Therefore, perceiving no errors to have been com-

mitted by the trial court prejudicial to the substantial rights of the appellant, we, after a careful consideration of the record, have concluded that the judgment should be, and it is, affirmed.