## Williams v. Commonwealth.

Dec. 15, 1939.

J. P. Chenault and Clay Shackelford for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

The grand jury of Madison County, in October, 1938, returned a true bill charging appellant with the crime of incest, committed by having carnal knowledge of his daughter, knowing at the time of the relationship; an offense denounced by Section 1219, Kentucky Statutes.

He was found guilty, the jury fixing the penalty at confinement for a period of seven years. In his motion and amended motion for a new trial, he set up six or more grounds. In brief on his behalf it is insisted that the verdict is flagrantly against the evidence, and that the court should have sustained the motion so as to allow appellant to introduce alleged newly discovered evidence.

The record discloses that appellant was about 49 years of age; he had been married about 29 years, and was the father of seven children. He lived with his wife and three or four of his children for a time in a cabin a short distance back from a main highway. During the spring of 1938, and up until about May 10, his wife and the three younger children lived together in the cabin home. Near the date stated the wife left home because of some trouble between her and the husband, taking the three children with her to the homes of the childrens' maternal grandparents, and a sister of Mrs. Williams.

Appellant made inquiries as to the whereabouts of the children, and about May 30, after getting some advice as to his right to take his children home, he and another daughter went to the grandparents' home, and with Zephra and Floyd, the two youngest, he returned to his home. The girl was twelve years old; the boy ten. They remained with the father until the latter part of the month, when the two children left and went back to the home of the grandparents. The mother, about the first of June, had gone to Independence to the home of a relative, and remained there until she learned that the husband had mistreated the young daughter.

The prosecutrix testified to the above facts, and said that while they were at their father's home she and her brother occupied the same room with him, she occupying one bed and the father and Floyd the other.

She says that about ten days or two weeks following their return, the father went to the mail box one morning, leaving them at home. She said to Floyd, "This is the only chance we've got to go; I can't stand it another night." The two left and walked for the greater part of the ten or twelve miles to the grandparents' home, where the girl told her troubles, the relating of which led to the arrest of the father.

In testifying she said that she and Floyd would retire around 6 or 7 o'clock. At about 11 o'clock the father would come and get in bed with her. "He got on me and smothered me with a pillow, and told me if I told it he would kill me." She says that the same thing occurred every night from the time the father brought her back from the grandparents' home, until she and Floyd left home, with, perhaps, the exception of one night.

Further testifying she said:
"It would be about eleven o'clock; I would go to sleep and he would come and get in bed with me. Got on me and smothered me. Next morning my brother went after the cows, and he (referring to the father) said 'if you tell this on me it will ruin you and me both.' He said he would kill me if it took him one hundred years to do it. I tried to get loose and he choked me. My brother heard me crying. I told him what he was doing to me."

She said that on each of the occasions the father had intercourse with her.

It developed upon examination that the girl had become infected with gonorrhea. In testifying she said that she did not know what the trouble was, but something was burning or hurting her about her private parts. The doctors later testify as to her condition.

Floyd, the younger brother, testified as to the general situation, about his sister and himself running away from home, and as to the family's retiring habits. He says his father stayed in bed with his sister "a whole lot of nights just before they ran off." He heard the father tell Zephra that if she did not lay still he would kill her, and she woke him up one night crying. He asked her what she had been crying about, and she answered: "You know why."

At this point it may not be amiss to comment on the testimony of these two children, particularly so since counsel for appellant, admitting that if the testimony of the children be true, the conviction should be sustained, but that their story is a fabrication, and that they were coached by the mother, and perhaps other relatives, to bring this charge to satisfy a desire for revenge. We find little proof to lead to the conclusion that the jury so believed.

It is not shown what education Floyd had, but the girl had reached the fourth grade; in testifying she was clear and explicit in her statements. Her testimony covers more than 30 pages of typewriting, the greater part of which is taken up by a rather searching cross-examination, which she met in a remarkable manner. Floyd's testimony takes up 20 pages, and he also underwent a severe cross-examination, which did not, seemingly, disconcert him. The girl frankly admitted that on one occasion, while a relative was present in the home, and the relative asked her how her father was treating her, she answered, "all right," but it took her little time to explain that it was through fear that she made this statement.

Resuming the testimony, it is shown that after the children had fled from their home, and returned to the home of relatives, prosecutrix signed an affidavit for a warrant for the father. This warrant was issued on June 15. The issuance of the warrant led to the investigation by four doctors, all of whom examined the girl, and one examined appellant, as will be later shown. One

of the four had examined the girl prior to the issuance of the warrant.

All the doctors agree on the result of the examinations. They said the external parts of the organ were very much swollen, and there was a slight discharge of pus. They made careful digital examination, and found the hymen ruptured "on either side, so as to permit the introduction of two fingers without any trouble."

They all agreed that the condition of the parts as to rupture and distension was caused by an act of intercourse, or the introduction of some blunt instrument. One, or perhaps others, of the doctors examined more carefully as to the infection, a laboratory clinic examination, and agreed that she had the disease named above. It was further said by the doctors, that assuming an act of intercourse occurred on the night of June 3, the disease could have developed to the stage found on June 15.

Dr. Billington, the county health officer, examined the girl and agreed with the other doctors. He also later made eight examinations of the appellant, five of them laboratory examinations. He found that the appellant was not then suffering with the disease, but that he learned from the tests, and from a statement of appellant that he had previously (twelve years before) contracted the disease, and that in his opinion it was possible for appellant to have transmitted it. He explained that while appellant was not then to be classed as a "carrier" the germ is sometimes secreted in the prostate gland, but according to the law of percentage or average, he would say that the chances were against transmission, though such was possible.

It also appears that the doctor was under the impression that appellant had told him of a recurrence, but did not remember the time, if it was stated. He was also of the opinion that there could be a recurrence "after several nights of intercourse."

Appellant testified as to his age, the general situation of the home, and somewhat of the home life, and as to the rifts in the marital relations. Also as to the matter relative to the wife taking the children from home, and his efforts to return them. He gave the two children a good reputation. The girl helped him some about the cooking and house work. It may be said that aside from the one time when the boy said his father struck

him in the head with a hoe, there had been little difficulty in getting along with the children. He shows some state of ill-feeling between himself and wife, and her relatives. In answer to the question as to whether he had ever had intercourse with prosecutrix, he answered: "No, never in my life."

He admits that he told Dr. Billington that he had been infected with gonorrhea "some years ago," but denied that he told him of any recurrence. He also says that the boy visited him at the jail (it developed he was taken there by relatives) and in conversation the boy said, "Aunt Maggie told me what to say." This the boy denies. "Aunt Maggie," it seems, was one relative who had "been mad" at appellant for twenty-five years. He also says the girl never complained to him that she was suffering with pain.

A daughter of appellant testified that she was the one who went to the grandfather's house (the father had been warned to stay away) and brought the children back after their first trip to the grandparents' home. She says they seemed glad to go back. She also says that some time in April, the wife (and mother) had said that "if we would stand by her she would get rid of him, if she could get one of us girls to swear a lie on him, she could get rid of him," and she replied, "You had better not do that," and shortly after that the mother left home.

She also relates one instance when prosecutrix said, at one time when her uncle struck her, that she would swear a lie on him and get him in the penitentiary. Another sister, in a manner, testifies to similar facts; another tells of rather vague threats on the part of the mother to get rid of the husband "in some way or another."

There was then a lengthy colloquy carried on in trying to ascertain from the doctor whether or not, if the girl had the disease at the time the alleged intercourses occurred, it was possible for appellant to have done so without himself contracting the disease. His answer was, gauging it by the time of the examination, "it would be possible, but improbable." It would depend largely on the stage of the development.

The mother testified, mainly to family differences and the situation at the home, and the ill-feeling between

various parties. She denies certain statements attributed to her by the daughters. She also says that as soon as she learned by telephone that the daughter was in trouble, she hurried home. There is nothing in her testimony that would materially affect the issue, one way or the other.

As said in the outset, appellant by counsel is insisting that the jury's verdict is flagrantly against the evidence. He argues that the story detailed by the two children is a falsification, concocted by the mother for purposes of revenge; that she trained the children up to the story told on the witness stand. The question of veracity was one to be considered by the jury and not by this court. We have already given our appraisement of that testimony, and counsel fails to point to any particular portion that would cause us to underestimate the straightforward evidence.

It is vigorously argued that from the testimony of the doctors that it is possible and very probable that prosecutrix may have contracted the disease from "Uncle Otis," at whose home she stayed some time after leaving the father's home. It is true that the girl had heard it said that both her uncle Otis and his wife had this disease. But she says, very emphatically, that he had naught to do with her, and was positive (and uncontradicted) in saying that the only person who ever had intercourse with her was the appellant.

Appellant submits to this court that the "jury's finding appellant to be responsible for the condition of the daughter, was flagrantly against the evidence." She had, as said, been diseased by some one, "but it seems strange to charge that condition to appellant, whom every test shows that he was not diseased."

We are not reviewing a case where the appellant is charged with communicating a disease to his daughter, but the statutory offense of having carnal knowledge of her, knowing her to be his daughter, about which latter fact there is no dispute. Even if the girl had, either before or afterwards, contracted the disease by intercourse with another than the appellant, it would be no defense to him, but, if admissible, would only be a circumstance to be considered on his plea of innocence. In Mathis v. Com., 13 S. W. 360, 11 Ky. Law Rep. 882 we held that the court properly rejected testimony that prosecutrix had had sexual intercourse with others prior to the act.

charged to the father, because it did not bear on the issue before the jury on the trial of an indictment for incest.

In State v. Winningham, 124 Mo. 423, 27 S. W. 1107, 1108, on an indictment for a like offense, the court held it was not error to exclude evidence that a niece had unlawful sexual relations with other men, prior to the time accused had such with her. The court said:

"Had it been established beyond a reasonable doubt, it would have been no defense to this charge of incest against her uncle. When the relationship of the defendant to his niece was proven, and the sexual intercourse with her by her consent, the crime was established, and proof even that she was a prostitute would not have excused or mitigated his offense." Kidwell v. State, 63 Ind. 384; State v. Strattman, 100 Mo. 540, 551, 13 S. W. 814.

The amended motion for a new trial was grounded upon what was claimed to have been newly discovered evidence, though it can hardly be classified as such. Appellant filed his affidavit in which he recited that "the jury in hearing the evidence became misled and confused by the testimony of Dr. Billington, into believing that it was reasonably probable that this appellant was diseased, and had infected the daughter shortly prior to June 15, whereas the defendant had learned from competent medical authority that the contrary was properly deducible from the evidence of Dr. Billington." He also states that he and his counsel were misled and confused by the doctor's testimony. There is no claim of confusion or any misleading by the testimony on the real issue, which is mainly to be determined from the testimony of the prosecutrix and accused.

We have given careful consideration to the affidavits filed in support of the motion for a new trial on this ground. In our opinion there is nothing presented which would justify us in concluding that if a new trial were granted, the result would be different insofar as the question of guilt or innocence is concerned. It is only where the newly discovered evidence is of such character, or weight and materiality, as to lead the court to reasonably conclude that if presented on new trial a different verdict would be the result. Montjoy v. Com., 270 Ky. 470, 109 S. W. (2d) 1209; Bishop v. Com., 273 Ky. 157, 116 S. W. (2d) 307.

We have also held that a new trial could not be granted for new evidence of a witness who had previously testified, since on the ground alone there is shown a failure of due diligence. See Jeter v. Com., 268 Ky. 285, 104 S. W. (2d) 979; Ely v. Com., 239 Ky. 638, 40 S. W. (2d) 276, and numerous cases on some point under Key Number System 945-1, 6 Kentucky Digest, Criminal Law.

The case presented to us for review is out of the ordinary run of criminal cases which we are called upon to review. If the facts, as related by the prosecutrix, are true, as the jury evidently believed and had the right to believe, then appellant has escaped with a mild punishment, as to our minds the offense charged is the most abhorrent known to the common or statutory law.

However, we are not to sit as jurors to measure the weight and quality of the evidence presented. We are only to determine whether the jury returned a verdict, which upon review would lead to a conclusion that the jury was moved by passion and prejudice and thereby lost sight of the facts. We have no hesitancy in saying that such was not shown to be the case here. And we are as clearly convinced that there is a lack of merit in the claim of newly discovered evidence.

We have gone further than asked to by counsel for appellant. We have carefully scrutinized the evidence, and find no ground for complaint of admitted incompetent, or rejection of competent evidence. The instructions followed the language of the statute, and the usual form of "doubt" instruction. On the whole it appears to us that the court accorded to appellant a fair and impartial trial, and finding no error the judgment should stand.

Judgment affirmed.