## Sawyer v. Commonwealth.
(Decided Feb. 23, 1937)

ROSE and STAMPER for appellant.

B. M. VINCENT, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for Appellee.

OPINION OF THE COURT BY JUDGE BAIRD—Affirming.

The appellant, Granville Sawyer, was indicted by the grand jury of Owsley county at the March term,

1936, for the crime of the willful murder of one Frank Bowman. At the June term of said court in 1936 he was tried and a verdict was returned by the jury convicting him of the crime of voluntary manslaughter and fixing his punishment at confinement in the state reformatory for twenty-one years. He appeals from that verdict and from the judgment of the court.

His counsel assigns five reasons for the reversal: First, because of newly discovered evidence, which they claim they did not know and could not have known before the trial, which they assert if given the opportunity to introduce such evidence, would change the verdict of the jury; second, the failure of the court to admit certain testimony of Ralph Reynolds; third, the failure of the court to properly instruct the jury; that is, the court's failure to instruct as to the appellant's right to defend his sister-in-law, Sudie Smith; fourth, incompetent testimony of the witnesses, Hattie Bowman and Rodney Boles; and, fifth, that the verdict is flagrantly against the weight of the evidence.

We will discuss each question in their order. Appellant claims that after his trial and conviction he learned for the first time that he could prove some threats made by the deceased, Frank Bowman, on the day that the killing occurred, by three witnesses to wit, Ed Riley, Arco Brandenburgh, and Henry Smith. These three witnesses practically make the same statement. In substance their evidence is as follows: They claim that "they were in Booneville about 11:30 or 12:00 noon on the day that the deceased, Frank Bowman, was killed; that they saw him at Ed Wilson's beer saloon; that he was drinking and appeared to be intoxicated; that they heard someone say to him that he had better go home as he would get in jail; that his answer was that he would not get in jail; that he was going to Sugar Camp and tear it all to H——; that they also heard him say that Fannie Sawyer and Sudie Smith had beat up his sister and that Granville Sawyer had stood by and seen them do it and that Granville Sawyer was the fellow he was after." There is no evidence at all that any one communicated the threat to appellant before the killing.

It is the rule of this court, which has been followed in many cases, that newly discovered evidence

will not authorize a new trial unless it be of such a character that unexplained it would probably induce the jury to reach a different conclusion. We think the case of Lassiter v. Commonwealth, 249 Ky. 352, 60 S. W. (2d) 937, 939, settles the question. In that case the court said:

"It is well settled that newly discovered evidence of such character is not sufficient to authorize the granting of a new trial unless it impeaches the only material witness in the case. Bates v. Commonwealth, 226 Ky. 318, 10 S. W. (2d) 1099; Jones v. Commonwealth, 238 Ky. 453, 38 S. W. (2d) 251. Where newly discovered evidence that is only impeaching in its nature affects the evidence of the sole witness upon whose testimony the conviction was necessarily had or when the newly dscovered evidence is of such a nature that unexplained it probably would have induced the jury to reach a different conclusion, a new trial will be granted. Hensley v. Commonwealth, 241 Ky. 367, 43 S. W. (2d) 996."

It is true that in this case the only witness introduced by the commonwealth that testified as to how the killing occurred was Hattie Bowman. However, the evidence of the three discovered witnesses would not in any way contradict her testimony because her testimony pertained almost exclusively to what occurred at the time of the killing. The evidence of these witnesses would be merely cumulative and would not of necessity impeach her testimony, but it would only be cumulative testimony introduced by the defendant as to the state of mind of the deceased and of threats that he had made against the defendant; therefore, we conclude that no error was committed in refusing a new trial on account of this newly discovered evidence. Branch v. Com., 200 Ky. 227, 254 S. W. 746; Roberts v. Com., 219 Ky. 777, 294 S. W. 480.

It is claimed by counsel for the appellant that it was error not to permit Ralph Reynolds to testify in full concerning the altercation that he had with the deceased Frank Bowman, on the day and a short time before the killing. It is admitted that no avowal was made of the testimony that the witness, Ralph Reynolds, might have given; therefore, this court cannot pass upon the question of the competency of said evi-

dence. However, in this respect, we will say that the only purpose of Ralph Reynolds' testimony was to show that the deceased was drunk and his state of mind at the time. That was done as the record shows, but the failure to make an avowal relieves his statement of any error. Again, it is insisted that the court committed an error in not instructing the jury that the appellant had the right to shoot and kill Frank Bowman in defense of his sister-in-law, Sudie Smith. We think counsel is in error in that contention because there was no contro versy or trouble between Sudie Smith and the deceased. In fact, Sudie Smith in her own testimony in substance stated that the deceased pointed his pistol at the appellant and not at her; there had been no trouble between herself and the deceased. There was no evidence of any effort on the part of the deceased to kill any one except appellant; therefore, there would be no evidence to justify an instruction of the court that the appellant had a right in the defense of his sister-in-law to shoot and kill the deceased. No error was committed in that respect. The instructions must be based on the evidence produced. Terrell v. Com., 194 Ky. 608, 240 S. W. 81.

The counsel complains that certain testimony made by Hattie Bowman and Rodney Boles was incompetent, but no objections were made at the time, no ruling was had by the trial judge and if any of the testimony was incompetent, it was waived by the defendant, so there was no error there, but it is further insisted that the verdict is flagrantly against the weight of the evidence. To pass upon that question, it is necessary to state the facts as presented by the record of the eyewitnesses to the killing. The record shows that only two witnesses undertook to give an account of the killing besides the appellant—one was Hattie Bowman, the wife of the deceased, and the other, Sudie Smith, the sister-in-law of the appellant. The testimony of Hattie Bowman in brief is this: She states that she and her husband lived on what is known as Sugar Camp creek in Owsley county; that her husband left his home about 7 o'clock on the 21st day of December to go to Booneville, which is about three miles from her home; that she did not see him any more until about 4 o'clock of the same day; that she and her husband were down in a hollow near Tuss Smith's, who from the evidence was the father-in-law of the appellant; that just before the shooting

she went around a path going toward Tuss Smith's and her husband crawled through the fence and just as he straightened up he said to her: "How are you going to get through?" that she did not have time to get through until she heard a loud sound of a gun; her husband then turned and ran down the bank to the draw bars and she ran through on this side of the fence and caught him as he fell down; that she did not see the one who shot him, only heard the loud sound of a gun, but saw no flash of the gun; that when he (Bowman) got down to the bars he fell through the bars and as he did so the pistol which she says that he had for some time previous fell out of his pocket. She heard no one before the shooting and did not see any one; that the only person that she heard speak was her husband when he asked her as he was going through the fence whether she could get through; that after her husband ran down the fence and fell through the bars, she placed his head in her lap and a pistol fell out of his pocket under him; that the pistol was unloaded; that in about five minutes after her husband was shot the appellant came down there and said: "Who was it he killed, and I asked him how came him to kill him, he said he didn't know who he was killing, said it was him, but he didn't know who it was when he killed him;" that she and her husband had started before the killing to Tuss Smith's, who was the father-in-law of the appellant, and that her husband said he wanted to hear some records that Smith had and he also said before he got up there that he had bought a quart of whisky from Granville Sawyer and was going to get it; that her husband at the time was about twenty-three years old. She also admitted that he was drinking or at least she smelled whisky upon his breath. That is substantially all of the testimony as to who did the killing that was offered by the commonwealth.

The appellant, Granville Sawyer, claims that he killed the deceased and was justified in doing so in his own self-defense. His testimony substantially is as follows: He states that some time prior to the killing Frank Bowman and Rodney Boles came to his home, but he did not see them; that he was in the house with the door closed, but he looked through a hole in the door that he bored with an auger to lock the door to put a chain through for the purpose of locking it; that he saw them as they came right up to his house and by

a kitchen that was nearby and that he heard them coming and heard one of them holler some fifty yards below the house; that they were drunk because he saw them staggering around like they were drunk; that in fact he saw them take a drink half way between his place and Tuss Smith's; that he was acquainted with Frank Bowman in that community and that his reputation was that while under the influence of liquor he was violent; that when they came to his house, he caused his wife to shut the door and he stepped back and sat down by the fire place on the bed and placed himself in a position that they could not see him; that his wife did shut the door in answer to his direction, and she told the deceased and his comrade, Rodney Boles, that the appellant was not there; that they hollered around a while and tried to get in the house. Both of them knocked on the door and kicked the door a time or two and cursed and went on out of the yard; he heard him say: "By G——, I know he is in there and I am going in to see if he is in there." As they started to leave, he heard him say: "By G——, I know he is in there, just as soon as I go home and come back, I will be back and see him then." They then went on down the road, but as they turned and started, Rodney Boles hollered back to his wife: "When he comes in he better not stay at home tonight, that Frank might accidentally come back and do something to him;" that he could hear them holler and curse as they went down the creek; that after they left he did up the little work that he had to do around his house and he and his wife started down to his father-in-law's, Tuss Smith; that it was getting dark then; that they had no information at that time where Frank Bowman was; as he went down to his father-in-law's with his wife they went down the hollow side by side; as they did so, they came first to a kitchen on the premises of his father-in-law. He stopped at the kitchen just a minute and then went on down to Tuss Smith's. She was in front of him about five or six steps; that as he approached Smith's home he saw Frank Bowman; that he came around from that kitchen near the fence, came around that corner up in the yard; that no one was with him as he came around the corner of the house; that no one was in sight and as he came around the house Bowman said this:

"Gran, you are the very son of a b—— I am looking for, I have come up here to kill you, G——

D—— you, I came after you today but you wasn't at home, and I have come back and have you right where I want you this time."

'That he had a pistol and as he made the statements aforesaid he was walking and he drew his pistol holding it in both hands and pointed it at him; that Bowman was then fifteen or maybe eighteen feet from him; that he (Sawyer) had his shotgun with him; that when he drew the pistol up that he was holding it in both hands and told him he was going to kill him; that he thought he was going to kill him; he then drew his gun out and shot him; that he shot him to save his life. He claims further that his wife had gone in the door at her father's; that Sudie Smith, his sister-in-law, was just behind him; that Bowman's pistol was pointed toward him and his sister-in-law, who was just behind him; that when he shot Bowman, he then turned his back to the appellant and walked back toward the fence that goes to the kitchen and started walking down toward the draw bars and he, the appellant, turned and went in the house; that after he went into the house which was Tuss Smith's house, he in about four or five minutes came out and went over to the draw bars under the bank and there he saw Hattie Bowman and Frank Bowman. Hattie Bowman was with the dead man's body. He is corroborated in his statements as to the killing by his sister-in-law, Sudie Smith. She states that just before the killing took place she was in this kitchen, where they cook, getting supper for her father; that Granville Sawyer's wife passed and Granville Sawyer came along behind her and that she followed Sawyer about three steps in his rear, when Frank Bowman stepped out from behind a building or an outhouse. He drew a pistol out, and he said to Granville Sawyer:

"You are the very G—— D—— Son of a B—— I am looking for and I am going to kill you, and Gran said, No, I reckon not, Frank, and he drew that pistol something like that [indicating] on Gran and Gran raised the gun and fired."

That at the time Granville Sawyer did the shooting he was standing near a little kitchen and about eight or nine steps from the kitchen; that the ground that Bowman and Sawyer were standing on was not level; that the place where Granville Sawyer was, was about three

or four feet higher than where Frank Bowman stood; that when Granville Sawyer shot Bowman he, Bowman, turned and walked down by a fence, which was the fence that went straight down to the draw bars; that Sawyer turned and went into Tuss Smith's house and she went in behind him. After she went into the house, she afterwards came out and went about half way down with Sawyer to where Bowman lay and Hattie Bowman was there; that about five minutes had passed since the shooting, and when she and Sawyer went down there they saw Frank Bowman's body.

The testimony of Granville Sawyer and his sister-in-law, Sudie Smith, constitute practically the entire testimony that was offered by the appellant to establish his plea of self-defense. From this testimony we are driven to the conclusion that if the story of Hattie Bowman is true, the appellant was guilty of willful murder and in fact of the assassination of Frank Bowman. On the other hand, if appellant's testimony and that of Sudie Smith be true, he was justifiable on the grounds of self-defense and apparent necessity. There was other testimony in the case tending to show and in fact conclusively showing that Frank Bowman when under the influence of whisky was very violent and dangerous. On the other hand, there was testimony offered by both the commonwealth and the appellant by divers witnesses that the reputation of Sudie Smith and also the reputation of Julia Smith and Willie Smith, other witnesses that testified as to certain acts and threats of the deceased, that happened a short time before the killing, that their reputation for morality was bad and that Sudie Smith's reputation as to truth and veracity was bad.

The appellant admits that he killed the deceased, but he undertakes to justify himself that he did so to save his own life. The testimony of Hattie Bowman was that the deceased was doing nothing to cause the killing, but was walking along a path in the direction of the appellant's home with an unloaded pistol when he was shot by some one who was above him and on higher ground than her husband; that the shot entered his body near the left collar bone and ranged downward. It is the rule of this court that where there is evidence, however slight, tending to show the guilt of the accused, the case should go to the jury. Simmons v. Commonwealth, 207 Ky. 570, 269 S. W. 732.

The court, after considering the testimony as a whole, is of the opinion that the killing did not occur as related by the appellant and corroborated by his witness, Sudie Smith, for the reason that the witness Hattie Bowman, while she was the wife of the deceased, however her reputation for morality or truth and veracity was not assaulted by anyone and in our judgment if it had been her purpose to misrepresent the truth, she could have easily said that she saw Granville Sawyer at the time he did the shooting and knew that he was the one that did it. However, the question of his guilt or innocence was peculiarly within the province of the jury. Hatfield v. Commonwealth, 264 Ky. 721, 95 S. W. (2d) 562, 564. We quote from that opinion as follows:

" 'We are forbidden from reviewing the evidence to determine if it justifies a conviction [Cornelius v. Com., 54 Ky. (15 B. Mon.) 539]; nor is it our province to pass upon the facts other than determine whether there is any evidence to support the verdict [Cornett v. Com., 156 Ky. 795, 162 S. W. 112], unless the verdict is manifestly wrong or palpably against the weight of the evidence [Miller v. Com., 231 Ky. 527, 21 S. W. (2d) 840; Ritchie v. Com., 243 Ky. 479, 48 S. W. (2d) 1072], and if there is any evidence affording grounds on which the jury's verdict might be sustained it is considered neither wrong nor palpably against the weight of the evidence [Newsome v. Com., 240 Ky. 333, 42 S. W. (2d) 306; Barton v. Com., 240 Ky. 786, 43 S. W. (2d) 55; Tussey v. Com., 241 Ky. 91, 43 S. W. (2d) 351].' Bullock v. Com., 249 Ky. 1, 60 S. W. [2d] 108, 111, 94 A. L. R. 407."

Therefore, it is the conclusion of this court that the evidence being conflicting and the jury being the sole judges of the testimony, the newly discovered evidence being merely cumulative, and the verdict not being flagrantly against the weight of the evidence and the instructions being correct and proper, we find no reversible error.

Wherefore, the judgment is affirmed.