## Haynes v. Commonwealth.

May 16, 1947.

W. J. Baxter, Judge.

Eversole & Eversole for appellant.

Eldon S. Dummit, Attorney General, and H. K. Spear, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

At his trial in the Madison circuit court the appel-

lant, Emmitt Haynes, was convicted of the crime of armed robbery with which he was accused in the indictment against him, an offense denounced by KRS section 433.150. His punishment was fixed by the jury at confinement in the penitentiary for a period of 21 years. His motion for a new trial was overruled, and from the verdict and the judgment pronounced thereon he prosecutes this appeal.

The motion for a new trial was filed May 29, 1946, but it was not finally acted on by the court until December 30, 1946, the delay being partially caused by the court summoning some alleged newly discovered witnesses and having them to testify in open court. It likewise appears that the court was in doubt as to whether or not the motion should, or should not be sustained, and the greater portion of the delay might well be attributable to the court maturing that question in his mind.

The grounds relied on in the motion were and are: (1) that the verdict is not supported by the evidence; (2) evidence offered by defendant erroneously excluded on objections by the Commonwealth, and incompetent evidence introduced by the latter to which defendant objected; (3) the verdict is the result of passion and prejudice on the part of the jury; (4) improper instructions to the jury, and (5) newly discovered evidence material to the defense.

The alleged robbery was committed between 6:15 and 6:30 p. m. on March 6, 1946, the alleged victim being Ernest Holbert, who was the manager of the retail store of the Kroger Grocery Company and has been such for four years, though serving in a similar capacity for his principal at other places for a total period of 16 years. The loot taken by the alleged robber amounted to $4,061, but about $1,500 of that amount consisted in checks issued to the firm by customers, or checks issued to employees of a manufacturing establishment in Richmond and cashed at the Kroger store.

The only witness who testified to the alleged robbery, and identified appellant as being the robber, was Holbert, who was the only employee of the grocery company present or in the store at that time. He testified that the rules of his employer required, after the day's sales ceased and all clerks left the building, that the

doors both in the front and at the rear should be locked, but he admits that on this occasion the back door to the store was not locked by him, nor were the outgoing front doors, but the incoming front doors were locked. It was further shown by counsel on cross examination of the witness that he had purchased a dwelling in Richmond in October, 1945, prior to the alleged robbery, and that he owed some $4,000 or more of the purchase money which was a lien on the property. That there may be a complete understanding of the merits of this case we insert at some length the description of how the robbery was perpetrated as given by that witness.

In describing how the offense was committed, he said:

"I was up front. I took the money from the third cash register. I put the money from each register in separate bags. I put them on my hand, they were burlap bags from the bank. I went to the back room, dropped the bags in front of the safe where we lock them up and fixing to bend down. Fixing to bend down to put them back in the safe and a man stepped from the front room and told me to put my hands up. The words he used, he said, 'all right, all right, I will take care of that.' I looked around surprized, didn't know any one was in the room. I turned around and the man was holding his hands right on me like this, right on me. He told me to move, said leave it lay and turn around and face the wall.

"Quite a surprize to me. I put my hands up above my head but didn't turn around. He said, 'listen kid, that money don't mean nothing to you.' Said, 'I am going to kill you, if you don't listen to me. Turn around and put your hands up and face that wall.' I turn around and put my hands up as high as I could, walked back and faced the wall, turned and looked over my shoulder, by that time I was nervous. He said, 'I am going to shoot the hell out of you.' I turned around as he directed, and walked to the wall. I couldn't get to the wall. He glanced around again and said, 'come over here and get in this rest room,' and said, 'keep quiet.' The door has a spring on it. The door came to. He said, 'is there a lock on that door?' I told him, 'there was not.' He said, 'keep quiet and stay in there,' said,

'I am going to be busy gathering this up, I don't want to hear anything out of you.' I stayed inside then, then I got to listening and I heard paper sacks rattling, I knew he was gathering up the money. When there wasn't any kind of noise out there and I heard nothing else I opened a crack in the door and looked out. I didn't see anything or anybody. I rushed out and called the highway patrolman and the local policemen.''

He further stated that the robber presented and threatened to use a .45 caliber pistol whereby witness was forced to do his bidding.

No trace of the alleged robber was discovered until March 16, 1946, 10 days following the alleged robbery, although in the meantime witness made a trip to Lexington, Kentucky, to see whether or not a suspicious character discovered by the police in that city could be identified by him as the robber, but which he could not do. In giving a description of the alleged robber, on the same night it is alleged to have occurred, witness stated that he was six feet or possibly more tall, weighed about 180 pounds, and some of the witnesses present at the time testified that he said the thief wore a mustache and slight sideburns, while other witnesses stated that he made no reference in his description of the alleged thief to the mustache and sideburns. He did testify on the trial, however, to such descriptive facts.

On the morning of March 16, James Scarbrough, a constable in Madison County telephoned Holbert to meet him (the constable) at the sheriff's office which request witness obeyed, when Scarbrough proposed that the two take a stroll over the city of Richmond to see if any one could be discovered that the witness could identify as the robber. While so engaged appellant was seen walking toward a furniture store located in the city, with his side toward witness and the constable, and the witness expressed the opinion that appellant resembled the robber, though he was not positive. The two concluded to follow him and when appellant went into the furniture store witness followed him therein, and from his appearance, as well as his voice, witness said he was the guilty one. In the meantime appellant in the presence of the constable drew a dirk which was concealed upon his person and handed it to the proprietor of the furni-

ture store to be kept until appellant called for it. As the dirk was conceived by the constable to be a deadly weapon he arrested appellant and carried him to the police station where an affidavit, later made by Holbert, was prepared and signed by him, wherein he accused appellant of having committed the robbery; but whether or not the affidavit was sworn to on that occasion is not clear from the record. However, Holbert did request the sheriff to not execute it by arresting appellant on that charge until he (witness) had further time to mature in his mind whether or not appellant was the robber. The next day the sheriff was informed by the witness to go ahead and execute the warrant which was later followed by the return of the indictment under which appellant was tried.

Some years prior to the alleged robbery appellant resided for a short while in the city of Richmond, and a witness for the Commonwealth—who at the time of the alleged commission of the crime was in charge of the garage of the grocery company adjoining its store— testified that appellant came upon the parking grounds between 2 and 3 p. m. on March 6, 1946; that he knew appellant because he, when appellant resided in Richmond, was engaged in the dairy business and had delivered milk to appellant whereby he became well acquainted with him. Another bit of testimony, which might be considered of an incriminating nature, was testified to by the constable who stated that on the way from the furniture store to the police station appellant said, "I bet this is over that damned Kroger business," but which was vigorously denied by appellant in giving his testimony.

The defense was an alibi. It indisputably appears that appellant, on the occasion of the alleged robbery, and his wife resided with the latter's parents in Estill County, 14 miles from Richmond, and that near thereto one Norman Fain and wife, Myrtle, operated a small country grocery which was patronized by appellant's father-in-law and his family, as well as by appellant and his wife. The name of appellant's father-in-law is Wiley Richardson, and he and his wife, his son, Shelt Richardson, and his wife, their granddaughter, Martha Jane Harrison and her husband, Jennings Harrison, all testified that they were at the home of Wiley Richardson on

March 6, 1946, and that appellant had secured from Shelt Richardson the right to occupy a vacant house owned by the latter and located some 2½ or 3 miles from the home of Wiley Richardson. On the road between Wiley Richardson's residence and the vacant house there was located the Fain store, and also the residence of C. W. Tucker. The witnesses all stated that between 8 and 9 a. m. on the morning of March 6, appellant and his wife started walking to their future residence for the purpose of cleaning it and rendering it suitable for occupancy, carrying with them some brushes, a mop, a bucket and perhaps other appropriate articles; that between 5 and 6 p. m. on the same day they returned to the residence of Wiley Richardson after accomplishing their mission. Mrs. Fain, as well as her husband, Norman, each testified (he at the trial of the motion for a new trial) that appellant and his wife soon after their departure from the home of Wiley Richardson stopped at their store between 8 and 9 a. m., and bought some soap, lye and other articles useful in doing their proposed work. Those articles were charged to appellant, and at the trial Mrs. Fain who testified (but her husband did not on the trial but did on the motion for a new trial) identified a sales slip of the articles sold to appellant on that occasion bearing the date of March 6, 1946.

Further along enroute to accomplish their mission appellant and his wife passed the residence of C. W. Tucker—who was not summoned, nor did he testify, being one of the newly discovered witnesses—and they also passed the same residence on their return trip. They were each seen and recognized by Tucker, to which he testified, first by an affidavit as to what his evidence would be, and filed with the motion for a new trial. He again testified in court at the hearing of the motion for a new trial.

There were a number of alleged newly discovered witnesses embodied in appellant's motion for a new trial, but only two of whom were shown to be able to establish appellant's alibi defense, they being Norman Fain and Tucker. However, since Norman Fain had been summoned as a witness, but did not appear and testify at the trial, his testimony could not be made available, since the requisite diligence in procuring his attendance

was absent. It was shown that neither appellant, his wife, nor his attorneys knew anything about what Tucker would testify to until after the trial, although it is true that Tucker later testified that appellant and his wife did engage him in a short conversation on the forenoon trip to the vacant house they were to occupy; but he did not state that either of them saw or knew that he had seen them pass his residence in making their return trip to the home of appellant's father-in-law between 5 and 6 p. m. of the same day. We therefore have six witnesses establishing appellant's alibi, one of whom was himself, but all of whom were related to his wife by blood or marriage, and to him by marriage alone; whilst Mr. and Mrs. Fain were not related to appellant by either blood or marriage, but who may have been in sympathy with him or his father-in-law's family because they were patrons of the Fain grocery. However, Tucker was not related either by blood, marriage or any business relationship to appellant. He appears to be a substantial citizen, 78 years of age, and to possess no incentive, either actual or imaginary to falsify in behalf of appellant. He testified that the reason he was not mistaken as to the date when he saw appellant and his wife in making the two trips past his house, as stated above, was that he had arranged with a neighbor by the name of Baker to transport a young beef to the Richmond stock yards to be sold on March 7, which was done by Baker and the animal sold, and that he was positive that it was on the day prior to that date that he witnessed the trips of appellant and his wife, to which he testified.

After a most careful consideration of this case we have concluded that none of the grounds set forth in motion for a new trial should be sustained, except that of newly discovered evidence contained in ground (5). We are forced to the conclusion that since the Commonwealth's testimony, as hereinbefore related, is, to say the least of it, somewhat shrouded in doubt as to the conclusiveness of appellant's identification as the guilty one, and that he should be granted a new trial so that he may obtain the benefit of the discovered testimony of Tucker. All of appellant's witnesses to establish his alibi, except Tucker, were, as we have said, related to him in the respects hereinbefore stated, and Tucker's

testimony, a totally disinterested witness, might well have convinced the jury of appellant's innocence and caused it to return a verdict different from the guilty one they did. In reaching that conclusion we are perfectly aware that this court has said on many occasions that a jury in returning its verdict was not bound to find for the litigant who introduced the greater number of witnesses, but that on the contrary its verdict would be sustained when rendered for the litigant in whose behalf a lesser number of witnesses testified.

We have also not overlooked the fact that an alibi defense is frequently interposed and supported only by relatives interested in the defendant's acquittal, in which case courts and juries are less inclined to give it credit. But when the proof establishing the alibi is of a convincing character and supported by a totally disinterested witness or witnesses, it constitutes a complete and effective defense. Therefore, in view of the doubt we entertain from reading the entire record of the guilt of appellant, we have concluded that the court should have sustained ground (5) urged and relied on by him in his motion for a new trial and to thereby afford him an opportunity to strengthen his alibi by the testimony of the totally disinterested and newly discovered witness, Tucker, establishing his alibi.

The testimony of all other alleged newly discovered witnesses, as set out in support of ground (5) in the motion for a new trial, relate to, and are directed toward, contradictions of some of the Commonwealth's witnesses as to what they testified and as to what they had said in the presence of such absent witnesses, practically all of which related to testimony of but little materiality, if any at all. However, upon another trial, if one should be had, such testimony so far as relevant and material may be obtained.

Wherefore, the judgment is reversed with directions to set it aside and to sustain the motion for a new trial and for other proceedings consistent with this opinion.