Robert FOLEY, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 1999–SC–0366–MR.

Supreme Court of Kentucky.

Nov. 22, 2000.

As Modified on Denial of Rehearing
Oct. 25, 2001.

Timothy T. Riddell, Milton C. Toby, Perch and Toby, Lexington, for appellant.

A.B. Chandler, III, Attorney General, Frankfort, Connie Vance Malone, Paul D. Gilbert, Assistant Attorneys General, Office of Attorney General, Criminal Appellate Division, Frankfort, for appellee.

COOPER, Justice.

Following a 1994 trial by jury, Appellant Robert C. Foley was convicted and sentenced to death for the murders of Kim Bowersock, Calvin Reynolds, Lillian Contino and Jerry McMillan. Judgment was entered on April 27, 1994 and affirmed by this Court on April 24, 1997. *Foley v. Commonwealth*, Ky., 953 S.W.2d 924 (1997), *cert. denied*, 523 U.S. 1053, 118 S.Ct. 1375, 140 L.Ed.2d 522 (1998). On March 4, 1998, Appellant filed a motion for a new trial on grounds of newly discovered evidence. RCr 10.02; RCr 10.06.[1] He also filed a motion for funds to perform ballistics tests on two car doors alleged to be part of his newly discovered evidence. Both motions were denied and that denial is the subject of this direct appeal to this Court. *Skaggs v. Commonwealth*, Ky., 803 S.W.2d 573, 577 (1990), *cert. denied*, 502 U.S. 844, 112 S.Ct. 140, 116 L.Ed.2d 106 (1991).

The victims were last seen alive on October 8, 1989. Their bodies were found two years later in a septic tank located on the "Murphy Gross property" in the Bald Rock community of Laurel County, Kentucky.[2] When the bodies were discovered, the property was titled in the name of Appellant's father, John Foley. Murphy Gross had died on August 30, 1989, and his widow had deeded the property to Appellant's father in June 1990. However, during a hearing on his pretrial motion to suppress evidence of the discovery of the victims' bodies, Appellant admitted that he was the actual owner of the property and that he had placed the title in his father's name to protect it from a judgment creditor. The property was resold to a third party in July 1993, long after the victims' bodies were discovered and Appellant had been charged with their murders. The Murphy Gross property lies adjacent to property which was owned in 1989 by Murphy Gross's nephew, David Gross. David Gross and his domestic companion, Phoebe Watts, along with Watts's two minor children, lived in a cabin on that property. Gordon Canter had previously lived in the cabin, and he and Gross grew marijuana on the property. There is substantial evidence in the record that Appellant,

---

1. RCr 10.06(1) requires a motion for new trial on grounds of newly discovered evidence to be filed within one year after the entry of judgment "or at a later time if the court for good cause so permits." Although the record is silent in this regard, we assume the trial court made a finding of good cause, since he decided the motion on its merits.

2. The victims were murdered in Laurel County, but the trial was held in the Madison Circuit Court on a change of venue. KRS 452.210.

Gross, Canter and Paul (Butch) Riley, a key figure in Appellant's motion for a new trial, engaged in various criminal enterprises together during the late 1980's.

To place Appellant's newly discovered evidence in proper perspective, it is necessary to review the evidence that was known at the time of his trial. Kim Bowersock, Lillian Contino and Jerry McMillan all resided in Van Wert, Ohio. Calvin Reynolds, Bowersock's boyfriend, lived in a house in Laurel County, Kentucky, not far from David Gross's cabin. While returning from Murphy Gross's funeral on September 2, 1989, Reynolds was arrested and charged with driving while intoxicated (DUI). Bowersock and Gordon Canter were passengers in Reynolds's vehicle at the time. They were charged with alcohol intoxication and subsequently released. Reynolds, however, remained in jail until October 7, 1989.

Bowersock's cousin, Theresa Duncell, also of Van Wert, Ohio, testified that on October 8, 1989, Bowersock was trying to find someone to drive her from Van Wert to Kentucky. There is evidence that Bowersock intended to pick up Reynolds in Kentucky and bring him back with her to Ohio. Duncell was unable to make the trip, but agreed to help Bowersock find someone else to drive her to Kentucky. They proceeded first to Lillian Contino's residence, but Contino's car was not in working order. Contino, however, offered to accompany Bowersock to Kentucky if they could find a ride. The three women then proceeded to the residence of Duncell's sister, where, by chance, they encountered Jerry McMillan. Bowersock asked McMillan if he would drive her to Kentucky and McMillan agreed to do so.

Reynolds was supposed to meet Bowersock at David Gross's cabin. However, when Bowersock, Contino and McMillan arrived at the cabin, only Gross and Gordon Canter were there. Reynolds had returned to his own residence. The three Ohio residents then picked up Reynolds at his residence and all four returned to Gross's cabin. Meanwhile, Canter had telephoned Appellant to tell him that Bowersock was in the area. According to Canter, Appellant had a grudge against Bowersock because he believed she had informed his parole officer that he (Appellant) was selling drugs and "moonshining" illegal whiskey. (Appellant admits in one of his post-trial affidavits that he, Canter and Gross sold drugs and "ran a moonshine still.") Upon being informed that Bowersock was in the area, Appellant told Canter that he was going to "kick her a___," asked Canter how many people were with Bowersock, and told Canter to meet Appellant at his house and to bring his (Appellant's) guns.[3] Three other witnesses, Allen and Imal Zannet and Appellant's ex-wife, Marjorie Foley, were in the same room with Appellant when this conversation took place and all confirmed Canter's version of the statements made to him by Appellant. Marjorie Foley further testified that Appellant told her when he left that night that if he did not return by morning, he would be either dead or in jail and that she should so notify his parents in Harlan County. When Appellant did not return the next morning, Marjorie notified Appellant's parents who then drove to Laurel County to investigate.

Appellant and Canter arrived at David Gross's cabin shortly after 11:30 p.m. on October 8th. Those present in the cabin when they arrived were Bowersock, Reyn-

---

**3.** Apparently, Canter was in possession of Appellant's handguns because Appellant, a convicted felon, would be guilty of a class D felony if found in possession of such weapons. KRS 527.040.

olds, Contino, McMillan, David Gross, Phoebe Watts and Watts's two minor children. Canter and Watts both testified that immediately upon entering the cabin, Appellant went to Bowersock and grabbed her by the hair. When Reynolds arose to her assistance, Appellant drew his 9–mm pistol and shot Reynolds first, then Bowersock, then Contino, then McMillan. He pointed the gun at David Gross, but did not shoot when Gross begged for his life. Appellant then returned to Bowersock and shot her again in the head. Following the murders, Appellant, Gross and Canter confiscated the victims' valuables and removed the bodies from the cabin to a log-hauling trailer. Watts then cleaned up the cabin while the three men took McMillan's car to Lexington and abandoned it in a motel parking lot. Canter testified that Appellant, identifying himself as Calvin Reynolds, called an automobile repair shop, requested that the vehicle be picked up for repairs, and promised to retrieve it at a later date. Canter stated that he never saw the vehicle again and all efforts to locate it prior to trial were futile. The three men returned to Gross's cabin and slept the following day. The next night, they removed the victims' bodies from the trailer, placed them in Murphy Gross's septic tank, and covered them with lime and cement.

In October 1990, David Gross was shot and killed in a murder which remains unsolved.[4] In the fall of 1991, Appellant was arrested for killing two Laurel County brothers, Lynn and Rodney Vaughn. See *Foley v. Commonwealth*, Ky., 942 S.W.2d 876 (1997), *cert. denied*, 522 U.S. 893, 118 S.Ct. 234, 139 L.Ed.2d 165 (1997). Shortly thereafter, Watts, who then lived in Tennessee, and Canter, who then lived in Arizona, came forward separately and gave virtually identical statements to the police about the murders of Bowersock, Reynolds, Contino and McMillan.

The theory advanced in Appellant's motion for a new trial is that David Gross and Gordon Canter killed the four victims because they had stolen "a lot" of marijuana from Gross, and that the victims were shot not in Gross's cabin, but while seated in McMillan's car. Further, McMillan's car was not driven to Lexington and abandoned in a motel parking lot, but was instead dismantled, the car seat burned, the car doors burned and deposited in a valley referred to locally as "the egg," and the remainder compacted at a Laurel County salvage yard. The initial "newly discovered evidence" supporting this theory was an anonymous, handwritten letter that Appellant claims to have received in October 1996. Appellant showed the letter to his attorney, who advised him that an anonymous letter would not support a motion for a new trial.

Appellant later produced a typewritten letter from Paul (Butch) Riley, one of his former criminal associates, dated May 17, 1997, less than thirty days after the rendition of this Court's opinion affirming Appellant's conviction and sentence. The letter was signed, "always and ever your friend and brother Butch." Both Appellant and Riley are inmates at the state prison at Eddyville.[5] The substance of Riley's letter is that during the summer of 1994, while Riley was incarcerated in a federal penitentiary in Terre Haute, Indiana, he had a telephone conversation with Gordon Canter, who was then at the

---

4. There is evidence in the record that Gross's body was found in the front yard of Appellant's residence with a bullet through the heart.

5. The Commonwealth asserts that Riley is serving fifty-five years for convictions of various criminal offenses.

Grand Hotel in Hamilton, Ohio; and that Canter told him that Appellant did not commit the Bald Rock murders. (Riley's letter did not assert that Canter admitted committing the murders, himself.) Canter denies the conversation and denies ever staying at the Grand Hotel. The record also contains the affidavit of Linda Sheehan to the effect that in the summer of 1994, she forwarded calls from Riley to the Grand Hotel where Riley's mother was employed as a bartender. Sheehan does not state that she forwarded any calls to Canter. Riley's letter was subsequently reduced to an affidavit, which states in pertinent part:

> Gordon said he had to go to court and testify against Bob Foley and it was bugging him. That it was his way of coming clean and out from under it. Gordon said he had to go to court against Bob Foley on 4 more murder charges. I ask [sic] him what was up and he said they had Bob Foley on 2 other murder charges and he was going to fry anyhow, and besides if Foley had of [sic] been there he would have been in on it anyway. Gordon said the ones that got killed had it coming because they stole a lot of pot from Dave Gross. He also said, Foley had got Dave Gross killed on a bad dope deal. Gordon told me he and Dave stashed the bodies in a trailer and later buried them in a[sic] old septic tank. That they used lime to eat up the bodies. Gordon even mentioned getting rid of part of the car in the egg pit and burning it. That the rest of the car went to the junkyard and was crushed. I asked Gordon just how many people was it that Foley had suppose [sic] to have killed. Gordon said, as far as he new [sic] just the 2 brothers in London. I said, so he didn't kill the 4 in the septic tank, and Gordon said no he didn't, but it didn't matter because

Bob Foley was going to fry on the other 2 murders anyhow.

Appellant's final item of newly discovered evidence is the affidavit of his "stepcousin," Chris Allen. According to Allen, he proceeded at Appellant's direction to a seventy-foot cliff above a section of "the egg." After rappelling down the cliff, Allen discovered two rusty car doors which appeared to have been burned. Each door contained two holes which Allen "thought could be bullet holes." Allen then discovered what he believed to be an automobile ignition key, a post office box key, and a set of "dogtags" (but not standard military identification tags) inside one of the door panels. The dogtags contained the name, address, social security number and date of birth of Jerry McMillan. McMillan's father and brother subsequently confirmed that McMillan owned and occasionally wore dogtags similar to those alleged to have been found by Allen. Allen hoisted the car doors out of "the egg" and took them to a body shop mechanic. The mechanic compared the doors to those on a 1975 Chevrolet Malibu and filed an affidavit to the effect that the burned doors "could possibly have come from a 1975 Chevy Malibu." In fact, the record contains several descriptions of McMillan's vehicle, none of which identify it as a Malibu. Canter testified that he thought the vehicle he drove to Lexington after the murders was a 1970 Chevelle. McMillan's mother filed a missing person's report in 1989 describing her son's vehicle as a 1975 Chevy Nova. Bowersock's mother told the police that her daughter had left Ohio on October 8, 1989 in a Pontiac LeMans with Ohio tag number 567–RTP.

While this evidence may be "newly discovered," Appellant's theory of the case is not. During his cross-examination of Gordon Canter at the 1994 trial, Appellant's attorney posited that Canter and David

Gross had killed the four victims and that Canter had decided to place the blame on Appellant because Appellant was already in jail on other capital charges. Canter denied this assertion. Further, Crocket ("Mel") Stevens, a self-described lifelong friend of Appellant, testified at trial that Canter told him in the spring of 1990 that he and David Gross had "offed" some people after "ripping them off." During his sworn statement given in response to Appellant's motion for a new trial, Canter produced a letter from Stevens, dated July 14, 1997, in which Stevens urged Canter to blame Gross for the murders, because "Dave is dead and no one needs to protect him any longer."

▪ Whether to grant a new trial on the basis of newly discovered evidence is largely within the discretion of the trial court, and the standard of review is whether there has been an abuse of that discretion. *Collins v. Commonwealth*, Ky., 951 S.W.2d 569, 576 (1997); *see also, Epperson v. Commonwealth*, Ky., 809 S.W.2d 835, 841 (1991), *cert. denied*, 502 U.S. 1065, 112 S.Ct. 955, 117 L.Ed.2d 122 (1992); *Commonwealth v.. Littrell*, Ky., 677 S.W.2d 881 (1984); *Combs v. Commonwealth*, Ky., 356 S.W.2d 761 (1962). It was formerly held that newly discovered evidence which merely impeaches or is collateral is insufficient unless it impeaches the only material witness in the case. *Bryant v. Commonwealth*, 272 Ky. 222, 113 S.W.2d 1118 (1938); *Sawyer v. Commonwealth*, 267 Ky. 388, 102 S.W.2d 371 (1937); *Lassiter v. Commonwealth*, 249 Ky. 352, 60 S.W.2d 937 (1933). Even under that standard, Appellant's newly discovered evidence would be insufficient since it only impeaches the credibility of Canter and not the credibility of Phoebe Watts. More recently, we have held that newly discovered evidence that merely impeaches the credibility of a witness or is cumulative is

generally disfavored as grounds for granting a new trial. *Collins v. Commonwealth*, *supra*, at 576. The evidence "must be of such decisive value or force that it would, with reasonable certainty, change the verdict or that it would probably change the result if a new trial should be granted." *Id.* (quoting *Coots v. Commonwealth*, Ky., 418 S.W.2d 752, 754 (1967)).

In *Epperson v. Commonwealth*, *supra*, the motion for a new trial was premised upon affidavits from prison inmates alleging, as here, that the prosecution's chief witness had admitted to them that he, not the defendant, had killed the victim. The affidavits were deemed to be merely impeaching and insufficient to require a new trial. In *Coots v. Commonwealth*, *supra*, evidence that the prosecutrix had made a post-trial statement to a police officer that the defendant had not molested her was held to be merely impeaching and not to require a new trial. Denials of motions for new trials were also upheld in *Parsley v. Commonwealth*, Ky., 321 S.W.2d 259 (1958) (evidence that the prosecutrix's mother later admitted that she had mistakenly identified the defendant as the person who raped her daughter tended only to impeach); *Jeter v. Commonwealth*, 268 Ky. 285, 104 S.W.2d 979 (1937) (alleged post-trial statement by prosecution's chief witness that contradicted his trial testimony with respect to whether the defendant killed the victim in self-defense was merely impeaching); *Alford v. Commonwealth*, 244 Ky. 27, 50 S.W.2d 1 (1932) (alleged post-trial statements of prosecuting witnesses contradicting their trial testimony that the victim was unarmed when he was shot was cumulative and impeaching).

While some of these results may at first blush seem harsh, they are based on the principle that a defendant is entitled to one fair trial and not to a series of trials based on newly discovered evidence unless that

evidence is sufficiently compelling as to create a reasonable certainty that the verdict would have been different had the evidence been available at the former trial; and that mere hearsay evidence that a trial witness made a post-trial statement inconsistent with his previous testimony is insufficient. Compare the following cases, which are illustrative of newly discovered evidence deemed sufficient to mandate a new trial: *Dolan v. Commonwealth,* Ky., 468 S.W.2d 277 (1971) (discovery after trial of the identity of a person who was present when the murder was committed, who possessed knowledge important to the case, and who was not related to the defendant); *Mullins v. Commonwealth,* Ky., 375 S.W.2d 832 (1964) (sworn statement of an eyewitness to the murder admitting that she perjured herself at trial); *McGregor v. Commonwealth,* Ky., 253 S.W.2d 624 (1952) (evidence that a key witness was suborned to give perjured testimony at trial); *Haynes v. Commonwealth,* 304 Ky. 753, 202 S.W.2d 400, 403 (1947) (discovery of an alibi witness with no family or business relationship with and "no incentive, either actual or imaginary to falsify in behalf of" the defendant).

Here, Riley's proposed testimony would only impeach the credibility of Canter's testimony. When confronted with Riley's affidavit, Canter denied its allegations and reaffirmed his previous testimony. Riley's affidavit does not impeach Phoebe Watts's testimony or the testimonies of the Zannets and Marjorie Foley, who overheard Appellant threaten to harm Bowersock and express his intent to arm himself shortly before the victims were murdered. Further, we agree with the trial court that the discovery of the two car doors is collateral and does not impeach Canter's testimony as to how the murders occurred or that he abandoned McMillan's car in a motel parking lot in Lexington. If anything, it only tends to bolster Riley's proposed impeachment evidence. Remember, Riley does not assert that Canter told him the victims were shot while seated in McMillan's car. The discovery of the car doors is just as supportive of a theory that Appellant, himself, retrieved McMillan's car from Lexington, dismantled it, deposited the doors in "the egg," and otherwise disposed of the remainder. Further supporting that theory is the fact that Appellant apparently was able to direct his step-cousin, Allen, exactly where to enter "the egg," which is described in the post-trial affidavits as a "large valley," in order to find the car doors. Finally, the only proof that the car doors came from McMillan's car is Allen's statement that he found two keys and McMillan's dogtags inside one of the door panels. Since all of the victims' valuables (and presumably identification) were removed from their bodies before they were buried, a jury could just as well believe that McMillan's dogtags and keys were retained by Appellant and subsequently "planted" inside the door panel at his direction, a theory which is just as plausible as a theory that the dogtags and keys all managed to fall into the door panel as McMillan was being shot and killed.

Appellant's theory that the four victims were killed because they had stolen "a lot" of marijuana from David Gross is belied by Theresa Duncell's description of the spur-of-the-moment decisions of Contino and McMillan to accompany Bowersock to Kentucky. Further inducing skepticism of Appellant's theory is the fact that Riley's affidavit recites the same motive for Canter's testimony that was suggested by Appellant's attorney at trial, *i.e.,* that Appellant would be sentenced to death for murdering the Vaughn brothers anyway, so blaming him for four additional murders was "no harm done."

■ Considered in light of the strong evidence of Appellant's guilt and the weakness of the evidentiary support for his alternative theory, we agree with the trial judge that Appellant's "newly discovered evidence," which is only impeaching in nature, is not of "such decisive value or force that it would, with reasonable certainty, change the verdict or ... probably change the result if a new trial should be granted." *Collins v. Commonwealth, supra*, at 576.

■ We also affirm the trial court's denial of Appellant's motion for funds for ballistics tests on the car doors. As concluded by the trial judge, such tests would prove at best that the holes were created by firing 9–mm bullets through the door from the outside surface. The only relevance of that fact would be circumstantial support for Appellant's unsubstantiated theory of the case. Furthermore, funds for ballistics tests are authorized only if use of the Kentucky State Police Forensic Laboratories Section is considered impractical. KRS 31.185(1). There is no such evidence in the record.

■ Nor do we believe the trial judge abused his discretion in denying an evidentiary hearing on these motions. Appellant filed numerous affidavits in support of his motion for a new trial, including two of his own. The Commonwealth countered with Canter's sworn statement denying Riley's allegations and reaffirming his trial testimony. Appellant responded with more affidavits impeaching portions of Canter's sworn statement. Appellant does not suggest what additional evidence he might have presented at an evidentiary hearing or how such evidence could overcome the fact that his "newly discovered evidence" is merely collateral and impeaching, thus insufficient to mandate a new trial.

Accordingly, the order of the Madison Circuit Court is affirmed.

All concur.