Robert C. FOLEY, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 93–SC–000828.

Supreme Court of Kentucky.

Nov. 21, 1996.

As Amended Dec. 2, 1996 and
Dec. 9, 1996.

As Amended on Denial of Rehearing
April 24, 1997.

Rodney McDaniel, Assistant Public Advocate, Department of Public Advocacy, Jennifer J. Hall, Department for Public Advocacy, Appellate Public Advocate, Frankfort, for appellant.

A.B. Chandler, III, Attorney General, Sharon Kay Hilborn, Assistant Attorney General, Paul D. Gilbert, Assistant Attorney General, Criminal Appellate Division, Frankfort, Thomas V. Handy, Commonwealth Attorney, London, for appellee.

GRAVES, Justice.

## FACTS

On September 2, 1993, the Laurel Circuit Court imposed two death sentences upon Appellant Robert Foley (hereinafter "Appellant"), pursuant to convictions for the murders of Harry Lynn Vaughn (hereinafter "Lynn") and Rodney Vaughn (hereinafter "Rodney"). Appellant appeals as a matter of right. Appellant sets forth twenty-six allegations of error which he contends mandate reversal of his conviction. After reviewing the record, studying the briefs, hearing oral arguments, and considering each of Appellant's allegations of error, we affirm.

The events that culminated in the Vaughn brothers' violent deaths began on the evening of August 17, 1991, when Appellant and ten other adults were at a home on White Oak Church Road in Laurel County, Kentucky. Adult guests present were Ronnie Dugger, Bill Dugger, Danny Bryant, Rodney Vaughn, Harry Lynn Vaughn, Marge Foley, Rocky Arthur, Lisa Arthur, Phoebe Watts, and Appellant's aunt. Five children were also present.

Other male guests had checked their pistols in the kitchen cabinet; however, Appellant kept his .38 colt snubnose revolver concealed in the small of his back under his belt. Rodney consumed enough alcohol to become belligerent and two fights subsequently erupted between Appellant and Rodney. Appellant admits he started the first fight by striking Rodney. Later in the evening, Appellant shot and killed Rodney. Rodney received multiple gunshot wounds to the left arm and trunk, which resulted in a multiple hemorrhage and death. Appellant claims he acted in self defense when he shot Rodney.

Shortly thereafter, Lynn was shot and killed at a time when only Appellant, Lynn, and Ronnie Dugger remained inside the house. Appellant claims that Ronnie Dugger shot Lynn, while Ronnie Dugger contends that Appellant shot Lynn in the back of the head. Lynn died as a result of multiple penetrating and perforating gunshot wounds to the head and extremities. After the killings, Appellant, Ronnie Dugger, Bill Dugger, and Danny Bryant dumped the bodies in Sinking Creek in Laurel County.

On October 18, 1991, the Laurel County Grand Jury indicted Appellant on two counts of capital murder, second degree arson, and being a persistent felony offender. Other factors, extraneous to the incident and charges but relevant to the trial, are pretrial statements by court officials and pretrial publicity.

On October 26, 1991, Appellant was charged with killing four other people whose bodies had been found in a septic tank in Laurel County. Prior to Appellant's indictment on these later charges, the Laurel District Court had restrained all law enforcement personnel of the Commonwealth and court personnel from making any public comments about this case. On October 4, 1991, the Laurel Circuit Court entered an order continuing the restraint and extending it to include Appellant's second indictment for four counts of capital murder.

Appellant alleges that respected officials in law enforcement made prejudicial public statements linking him to the killings. He was called the "worst criminal ever seen" and was referred to as a "remorseless killer." In support of the claim of misconduct by court officials, Appellant states that comments by Kentucky State Police Captain Doug Asher, Laurel County Deputy Sheriff Glen Holland, and Commonwealth Attorney Tom Handy violate Supreme Court Rule 3.130(3.6)[1] in that these three officials not only had spoken publicly about the Vaughn killings but also had mentioned the allegations of other criminal acts that took place outside of Laurel County.

Appellant further complains that the jury deliberated only twenty minutes, thus implying that there were not serious, thought provoking deliberations and that the jury had already decided upon guilt before submission of the case.

## I. VENUE WAS PROPER

▮ On January 4, 1993, the trial court set an August 11, 1993 trial date. However, On August 10, 1993, eight months after the date was set and on the eve of trial, Appellant filed for a change of venue. The petition for change of venue included 134 pages of exhibits and affidavits. On August 13, 1993, Appellant filed two supplemental petitions. He also filed 82 pages of exhibits with the court on the day of the change of venue hearing consisting of news articles appearing between August 23, 1991, and May 24, 1993, which stated that he was an FBI informant who would be serving jail time for another crime were it not for deals made with the government. In addition, Appellant stated that editorials had contained inflammatory remarks about him; local news stations reported that he was a suspect in the killings of seven other people; and witnesses at the scene of the slayings were quoted as saying that he had killed both the Vaughn brothers with two six shot revolvers. Appellant's mo-

tion was denied and trial commenced in August 1993.

The majority of the newspaper articles provided as exhibits by Appellant are from 1991. Twenty-nine pages of exhibits contain articles from 1992. Eight of the exhibits from 1992 detail the FBI involvement in the case; three ironically deal with the problem of pretrial publicity; and the remainder cite a pretrial motion, an assault committed by Appellant in jail, an article on court bailiffs and an article on the other capital charges pending against Appellant. Some of the articles submitted are duplicate articles from other papers including the *Herald–Leader* from Lexington, and the Louisville *Courier–Journal.*

In all, Appellant only offered 14 pages of exhibits from 1993, the year in which the case was tried. Of the 1993 exhibits, eight pages are accounts of a civil suit against the FBI by the victims' parents. The three main articles are the same story found in three separate papers. Also included in the 1993 exhibits are four updates from three papers and an article covering the deposition of the Commonwealth's witnesses. In reviewing the exhibits, it is evident that the articles were not so numerous nor inflammatory as to render Appellant's trial fundamentally unfair. *Deel v. Jago,* 967 F.2d 1079 (6th Cir., 1992). This is particularly true as the most recent reports, within a year of trial, provide only an outline of the charges which is substantially what the jury was read from the indictment.

▮ Part of Appellant's argument for a change of venue was that the publicity had clearly biased the jurors during jury selection. However, most of the publicity occurred in 1991 and was not specifically remembered by the jurors. Appellant emphasizes that only six of ninety-eight of the prospective jurors had heard absolutely nothing of the case, while one third of the prospective jurors either believed he was

---

1. Supreme Court Rule 3.130(3.6) prohibits lawyers from commenting in a prejudicial way on a pending matter. It is a reasonable inference that this rule also covers law enforcement officials working under the direction of the prosecuting attorney.

guilty or did not presume him to be innocent. In order for a change of venue to be granted there must be a showing that: 1) there has been prejudicial news coverage; 2) it occurred prior to trial; and 3) the effect of such news coverage is reasonably likely to prevent a fair trial. *Wilson v. Commonwealth*, Ky., 836 S.W.2d 872 (1992).

The voir dire revealed that, although almost every potential juror had heard of the case, most had heard little more than what was read to them from the indictment prior to voir dire. Ninety-eight jurors were questioned and sixty-three were excused. However, only eighteen were excused for having an opinion as to guilt, seventeen for the inability to give the presumption of innocence and six for having sufficient knowledge of the case to be struck for cause. Of the other excused jurors, nine had a bias toward police officers or the Commonwealth based on relationships with the victims, seven were against the death penalty, one could only vote for the death penalty and five for the inability to hear, religious preference, illness, connection with another capital case or representation by the assistant Commonwealth's attorney. Of the thirty-five that comprised the panel from which the jury was selected, particularly the fourteen that were seated, most had read of the crime when it first happened two years prior, and had not heard of it since that time. Two of the final jurors had never heard of Appellant or the crimes. *McQueen v. Commonwealth*, Ky., 721 S.W.2d 694 (1986), holds that the dismissal of 112 jurors from a pool of 153 did not prove bias and that the accused person could still obtain a fair trial. In this case only 18 of 98 jurors were excused for believing that Appellant was guilty, far less than the percentage in the *McQueen* case.

The amount of publicity alone is not the determining factor for a change of venue and the mere fact that jurors may have heard, talked, or read about a case is not sufficient to sustain the motion. *Foster v. Commonwealth*, Ky., 827 S.W.2d 670 (1991); *Dean v. Commonwealth*, Ky., 844 S.W.2d 417

(1992). The issue is whether public opinion is so aroused as to preclude a fair trial. *Kordenbrock v. Commonwealth*, Ky., 700 S.W.2d 384 (1985). There was no showing that the media accounts had persuaded the prospective jurors to the extent of prejudgment. At best they were aware of the crime and Appellant's name attached to it. However, this same information was provided to them on the first day of voir dire. Nonetheless, in *Foster, supra*, we upheld a capital murder conviction when all potential jurors had heard or read about the case.

In considering whether there should have been a change of venue, it is noted that the trial date was set in January 1993, long after most of the publications about the case. Appellant knew of his claim of a potential contaminated venire many months earlier when he requested a gag order on law enforcement officials and court officials in order to ensure a fair trial. He made no complaints during the months following the issuance of the gag order. *Taylor v. Commonwealth*, Ky., 821 S.W.2d 72 (1990), stands for the proposition that the prosecution must have a reasonable time period to prepare for a possible change of venue. This Court held in *Taylor*, which also resulted in the death penalty, that the trial court did not abuse its discretion in denying a change of venue.

> The prosecution was not given reasonable notice.... Accordingly without reasonable notification the Commonwealth could not present evidence in support of its opposition to the motion by subpoenaing witnesses to testify or otherwise prepare to contest the motion. (citation omitted). Therefore the trial judge did not abuse his discretion by denying the motion.

*Id.* at 76. Here, the trial court did not abuse its discretion in denying the motion because Appellant did not give legally sufficient notice.

## II. THE TEN JURORS WERE QUALIFIED

A majority of the prospective jurors stated they read about the case when it first

appeared, two years prior, but they could not remember any details. Three days of jury voir dire elicited facts which Appellant claims revealed implied bias in ten prospective jurors who should have been excused for cause. Concerns regarding these jurors included pretrial knowledge of other crimes, ability to put that knowledge out of their mind, and the ability to afford Appellant the presumption of innocence. These ten jurors are Juror A[2], Juror B[3], Juror C[4], Juror D[5], Juror E[6],

2. Juror A was aware that bodies had been dumped in the creek and that Appellant was a suspect. When asked her feelings about the killings, she related that she knew others who felt he was probably guilty and that she felt the same. She qualified her statement by explaining she had heard only one side of the issue and could not make a definitive judgment until she had been presented all the facts. She knew Appellant was accused of four other murders. Juror A convinced the trial court that she would do her human best to base her verdict solely on evidence presented in open court.

3. Juror B related that he had heard Appellant was guilty of killing the two Vaughn brothers; however, that was over two years ago. He couldn't recollect if he had ever said that Appellant was guilty. He didn't think that he had made such a statement, but he could not say for sure. In answer to a direct question, Juror B answered that he had no idea if Appellant was guilty because he was not aware of all the facts. He made this last statement with conviction seemingly wanting to emphasize he could remain fair during the trial. When defense counsel started questioning about mitigating circumstances that were likely to appear at the trial, the trial court warned counsel that this line of questioning in the future would result in the court's conducting all voir dire. Juror B stated that despite the massive publicity that had occurred two years before, it would not affect his rendering a fair and impartial verdict. He presumed Appellant innocent until the Commonwealth proved otherwise beyond a reasonable doubt. Appellant moved that Juror B be dismissed because of prior knowledge. The trial court ruled that knowledge of the death of the two Vaughn brothers was insufficient to preclude his ability to render a fair verdict.

4. Juror C heard people remark that the trial would have to be moved because many in Laurel County had already formed an opinion. She had read about the Vaughn killings two years ago and was aware that Appellant was charged with other killings. She had no opinion as to Appellant's guilt and recognized that accusations were not proof of guilt.

5. Juror D, the alternate juror, had heard news reports regarding the incidents but that two years had passed. He knew that Appellant had been arrested for murder and was suspected of other killings. He could not remember many details and had only vague recollections of the other killings. He stated that the people in the community had spoken of the case as it was developing two years before, but nothing about the case had been said recently. He knew Appellant was suspected of the Vaughn killings and admitted under questioning from defense counsel that most of the people in the community at that time believed that Appellant had killed both Vaughn brothers. He knew that all the news stories were negative towards Appellant and that Appellant's side of the story was never presented in the media. Though he would have suspicions due to the implicating evidence and the fact that Appellant had been arrested, Alternate Juror D stated that he would enter the court and jury deliberations feeling that Appellant was not guilty. He realized that Appellant had no obligation to prove his innocence and that the burden rests with the state. The most crucial issue was his understanding and acceptance of the legal significance of mitigating circumstances. When defense counsel asked if all possible penalties regarding a case involving multiple murders would be considered, Alternate Juror D replied that he would not consider the minimum sentence of twenty years and believed that despite mitigating circumstances multiple murders required more than the minimum sentence of twenty years which was not harsh enough. After examination by the court, he stated he would consider all penalties and circumstances. When defense counsel continued examination, he again stated that in his opinion multiple murders deserved more than a twenty year sentence. However, upon further questioning by the court, Alternate Juror D stated that if there were no mitigating circumstances with multiple murders, he would not consider twenty years. However, if there were other mitigating circumstances, he would then be able to consider the twenty year minimum sentence for multiple murders. Appellant moved to exclude Alternate Juror D from jury selection based on statements about sentencing. The trial court denied the motion because he agreed to consider all court instructions which would have the full range of penalties including the minimum twenty year sentence.

6. Juror E knew of the Vaughn brothers' killings, but that was all other than remembering Appellant's name being mentioned. He denied any additional knowledge of the case. Upon further questioning, he said he knew Appellant had been accused of killing the Vaughn brothers and could remember rumors of bodies found in a septic tank. The people he talked to about the case did not state that Appellant was guilty. When asked directly, Juror E stated he was not sure if Appel-

Juror F [7], Juror G [8], Juror H [9], Juror I [10], and Juror J [11]. All served as jurors except Juror D who was an alternate juror, and

lant was guilty or not. He admitted that all the press coverage had been negative and that Appellant's side of the story was not presented. The media coverage had caused him to suspect Appellant, but without all the facts, he had no opinion of guilt. He wished to hear Appellant's side of the story. He understood that Appellant must be proven guilty beyond a reasonable doubt and stated that the Commonwealth would have no advantage with him regarding this fact. He also understood that Appellant had no obligation to put on a case of his own and that the burden of proof always rests with the Commonwealth.

7. Juror F recalled reading about the shooting of the two Vaughn brothers and that they were thrown in a creek. He remembered Appellant's name being mentioned in the paper, but did not remember his being accused. Later, in response to further questioning, he recalled the paper referring to Appellant as an FBI informant who had been suspected of a previous killing. He stated that no one was guilty until proven so notwithstanding how the media might present the case. Nothing stuck in his mind regarding Appellant and he affirmed that he could be an impartial juror. He firmly believed that all persons were presumed innocent and not guilty until so proven at trial. The trial court denied defense counsel's motion to excuse for cause based on prior knowledge of the Vaughn brothers' killings and the accusations of other killings. The Appellant used a peremptory challenge to strike Juror F.

8. Juror G remembered reading that Appellant was an FBI informant. Upon direct questioning by defense counsel, she stated that she was not sure if she could remove all information from her mind during the trial and deliberations. She had no preconceived notions regarding Appellant. The trial court noted that the defense had suggested answers by asking leading questions. Defense counsel was admonished for commenting that a "speck was too much knowledge." The trial court was convinced that Juror G would follow the instructions of the court and decide the case only on the evidence presented in the courtroom.

9. Juror H had heard about the case on television and had read about it "a long time ago." She felt the news coverage was neutral in presenting only the known facts. She knew that Appellant had been accused of killing the Vaughn brothers. She was a distant relative of the Assistant Commonwealth Attorney who she did not know and had not visited. She pointed out that they did not socialize and that such relation would have no bearing on her deliberations as a juror in the case. She knew that Appellant was accused of killing four other persons and that four bodies were found in a septic tank. She had no ill feelings towards Appellant whatsoever and could put aside all news reports. She realized news reports were hearsay and that evidence was the sworn testimony given in court. Appellant moved to strike Juror H because of her knowledge of both charges against Appellant. The trial court ruled that this was insufficient knowledge to sway her opinion or to alter her ability to serve as a fair and impartial juror.

10. Juror I did not remember the details of the case because it had been too long ago. She could only remember the name of Appellant because other prospective jurors had stated that this could be the case coming before the court. She hadn't thought much about the case, and in order to remember details, she would have to think about it. She had other issues on her mind including the recent passing of her mother and consequently had not followed the case. Later, she recollected four bodies being found, but this knowledge was recalled only because there was direct suggestive inquiry by defense counsel. She could remember that there was something about the bodies of four people from Ohio being found in a septic tank. She did not connect other killings to Appellant until the defense counsel reminded her that he had been accused of those crimes. The trial court sustained an objection because defense counsel was "putting words in her mouth." She had no problem in presuming Appellant's innocence going into trial and in putting the publicity, which she barely followed, out of her mind. Appellant moved to excuse Juror I because of her knowledge of the Vaughn brothers' killings. The motion was denied because her recall was vague at best and her knowledge of other crimes had to be prompted by the defense counsel.

11. Juror J, the foreman of the jury, knew Appellant was accused of killing two people. He had heard this from the media. The defense attorney not only had represented family members of Juror J but also had opposed his family in other matters. He stated that the media had not swayed his opinion and he had formed no impressions of Appellant. When questioned concerning whether Appellant had any obligation to produce evidence to prove himself innocent, Juror J stated that he wanted evidence from Appellant to prove his innocence. Then, he explained that he had not understood that the defendant did not have to put on any evidence. After court procedures were clarified, he stated that if Appellant did not give any evidence during the trial, he would not hold it against him during deliberations.

Juror F who was struck by a peremptory challenge.

Defense counsel was permitted to explore in detail the source and extent of each prospective juror's knowledge of the crime and preconceptions as to Appellant's guilt or innocence. Individual voir dire clearly indicated that the jurors' recollections regarding the case had diminished with the passage of time. Most remembered very few details of the murder. Further, none of the jurors who served indicated that they had formed an opinion regarding guilt or that the information affected their ability to render a verdict based on the evidence presented at trial. The jurors who might have been influenced by their exposure to pretrial publicity were excused by the trial court. The trial court was satisfied that those who served did not have any preconceived opinions that would interfere with respective impartiality.

Most of the press coverage merely mentioned the facts of the case and largely did not elaborate on them. A majority of the reports were delivered by the printed media that had little distribution in Laurel county. Most of the factual information had been printed two years prior to the actual trial and most jurors had remembered hearing of the case, but could not recall details. *Skaggs v. Commonwealth,* Ky., 694 S.W.2d 672, 676, 683 (1985), is a Kentucky death penalty case which was affirmed by this Court even though there was a large amount of pretrial publicity attributed to the prosecutor. As in this case, the record reflected that the bulk of the pretrial publicity occurred long before jury selection began. *Skaggs,* supra at 676.

The volume of publicity which Appellant had claimed prejudiced his trial was simply not a factor. *Kordenbrock v. Commonwealth,* Ky., 700 S.W.2d 384, 387 (1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986). Further, in *Jacobs v. Commonwealth,* Ky., 870 S.W.2d 412, 416 (1994), this Court held that it was not the amount of press coverage, but its nature. Here the reports were factually and not emotionally based.

*Mu'Min v. Virginia,* 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991), gives the trial judge large discretion in determining a change of venue and whether there was a contaminated jury pool. A statement by the U.S. Supreme Court in *Mu'Min v. Virginia* is well worth repeating:

As noted above, our own cases have stressed the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias. Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect, and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The trial court, of course, does not impute his own perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire.

*Id.* at 427, 111 S.Ct. at 1906.

In *Montgomery v. Commonwealth,* Ky., 819 S.W.2d 713 (1991), we upheld the trial court's decision denying a change of venue, however, we reversed regarding the trial court's failure to excuse certain jurors for cause. We stated:

One of the substantial considerations in affirming the trial court on a change of venue issue is the trial judge's decision to permit a broad voir dire of jury to identify prospective jurors so affected by pretrial publicity that they should be excused for cause. The problem is that this approach carries with it a commitment to excuse such jurors when they have been so identified, and the record before us compels the conclusion that the trial court failed in this commitment ... Mere agreement to a leading question asking whether the jurors will be able to disregard what they have previously read or heard is not enough to

discharge the court's obligation to provide a neutral jury[.]

*Id.* at 716.

This case is different from *Montgomery* in that the trial court allowed extensive questioning of the jurors and carefully considered the challenges for cause advanced by trial counsel. The trial court carried out its responsibility under the *Montgomery* case and excused those jurors who had prejudged the Appellant. *Epperson v. Commonwealth*, Ky., 809 S.W.2d 835, 844 (1990).

## III. THE INSTRUCTIONS WERE LEGALLY SUFFICIENT

■ Appellant alleges that the trial court erred by omitting the intent element from the jury instruction regarding the murder of Lynn. As neither the Commonwealth nor the defense tendered any instructions, the Court prepared the same in compliance with the instructions set forth in William S. Cooper's, *Kentucky Instructions To Juries* (1993). Defense counsel made no initial objections to the instructions on the record.

Instruction number three initially provided:

> You will find the defendant, Robert Foley, guilty of Murder under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt that in this county on or about August 17, 1991, and before the finding of the Indictment herein, he killed Harry Lynn Vaughn by shooting him with a firearm.

Appellant argues that as a result of the omission of the word "intentionally", the jurors only had to find that he killed Lynn to convict him of murder in the first degree. During the reading of jury instructions, the omission of the word "intentionally" was noticed by defense counsel who brought the oversight to the attention of the trial court. The trial court inserted the word "intentionally" into instruction number three, which was amended to read: ". . . he intentionally killed Harry Lynn Vaughn by shooting him with a firearm." Both the original set of instructions and the amended instructions provided the definition of "intentionally." The trial judge delivered new corrected written instructions to the jury; however, he did not reread the corrected instructions orally in court.

During the Commonwealth's closing argument, the prosecutor read the amended instruction number three, and advised the jury that "at least one of those shots had to be intentional" for a finding of murder. When the jury deliberated, they had the amended instructions with them in the jury room. They were well aware of their duty to find the element of intent before finding Appellant guilty of the murder of Lynn.

The murder instruction, viewed in light of the evidence, required an implicit finding of intent to kill. The corrected instructions, as well, explicitly required the jury to find intent to kill. No reasonable juror could have concluded from the medical testimony that the injuries Lynn sustained were not intended to cause immediate death. The medical examiner's testimony revealed that the shot in the back of the head traveled along the base of the skull, through the spinal cord and brain stem and exited to the right of the nose. Ronnie Dugger testified the wounds to Lynn occurred after Rodney was shot and Appellant had retrieved a second gun. Lynn had his back to the Appellant and he was shot several times. Appellant explained that he had to kill his friend Lynn because "blood is thicker than water."

Any error in initially failing to set forth the element of intent in the instruction is harmless. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The United States Supreme Court has held that while a jury instruction that the law presumes a person to intend the ordinary consequences of his voluntary acts may violate the U.S. Constitution, it nevertheless is subject to harmless error analysis. *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Hence, both guilt and penalty phase capital trial instructions which contain presumptions of intent to kill have been held

harmless where there was overwhelming evidence that whoever killed the victim did so intentionally, and where the main thrust of the defense was non-involvement or intent was not in issue. *Tucker v. Kemp,* 762 F.2d 1496 (11th Cir.1985). The Appellant claimed that it was not he, but Ronnie Dugger, who killed Lynn Vaughn. Intent is not an issue for the defense when complete denial is asserted. *Slaughter v. Commonwealth,* Ky., 744 S.W.2d 407 (1987). The error, if any, was harmless.

Unpreserved error is subject to the analysis set forth in *Sanders v. Commonwealth,* Ky., 801 S.W.2d 665 (1990), to determine if there was reasonable justification or explanation for defense counsel's failure to object. The defense theory of the case was that the Appellant did not shoot and kill Lynn Vaughn. Appellant's claim of innocence may well have been weakened considerably in the eyes of the jury if defense counsel made the inconsistent argument: "my client did not kill the victim, but if he did kill him, he did not intend to kill him." The decision not to contest the issue of intent or object to the instructions is consistent with legitimate trial tactics.

It cannot be said as a matter of law that the circumstances in totality are such that, minus the alleged error, the Appellant might not have been found guilty of a capital crime. The final instruction provided the element of intent. The Appellant simply was not prejudiced by the initial failure to instruct on intent followed by the amended instruction correcting the omission. The unpreserved allegation of error was not prejudicial.

■■■ Appellant also claims that the trial court erred in failing to provide the jury with requested information as to consecutive and concurrent sentencing. We disagree. Although KRS 532.055(2) requires a jury to recommend whether the sentences should run concurrently or consecutively, such does not apply in capital cases. *Francis v. Commonwealth,* Ky., 752 S.W.2d 309, 311 (1988). Assuming that the jury had sentenced Appellant to a term of years for the murders,

failure to instruct on concurrent/consecutive sentencing would not require reversal. Should a jury hand down consecutive sentences that are out of the range of the statutes, the trial court has the power and duty to declare all sentences to run concurrently. *Stoker v. Commonwealth,* Ky., 828 S.W.2d 619 (1992).

## IV. EVIDENCE OF WITNESS INTIMIDATION WAS PROPER

■■■ Appellant claims error in eliciting testimony from Appellant's wife, Marge Foley, and Ronnie Dugger, a Commonwealth's witness, that she and Appellant's father intimidated Ronnie Dugger. Not until Appellant's cross-examination of Marge Foley was it revealed that there were pending charges for intimidation of a witness against her. When asked about the nature of the charges on redirect examination, the trial court overruled Appellant's objection because he had opened the door to this line of inquiry. *Thompson v. Commonwealth,* Ky.App., 648 S.W.2d 538 (1983). Inquiry revealed that she and Appellant's father were charged with intimidating Ronnie Dugger. The trial court correctly ruled that Appellant had opened the door to this testimony.

■■■ Evidence that a witness has been threatened or otherwise influenced in an attempt to suppress his testimony is admissible in a criminal prosecution only where the threat was made by, or on behalf of, the accused. *Campbell v. Commonwealth,* Ky., 564 S.W.2d 528, 531 (1978). Ronnie Dugger testified on redirect examination that after the shooting, he was taken to Harlan with Appellant's father and Marge Foley. They insisted he go with them. He stayed at Mr. Foley's a couple of nights and the next couple of nights in another home. He had neither a car nor a way to leave. Subsequently, he was taken to Louisville by someone he didn't know, but escaped when the stranger became drunk and fell asleep at a bar. On re-cross examination Ronnie testified that Mr. Foley told him anybody who testified

against Appellant wouldn't make it a block from the courthouse.

 This was permissible re-direct examination because Appellant had attacked the witness' credibility concerning his present incarceration for trafficking in marijuana. Ronnie stated he would be probated on the condition that he testify against Appellant. It is permissible to attempt to cure the impeachment of a witness' credibility.

 Evidence of intimidation of a witness was competent evidence as it was inconsistent with Appellant's innocence. Any attempt to suppress a witness' testimony by the accused, whether by persuasion, bribery, or threat, or to induce a witness not to appear at the trial or to swear falsely, or to interfere with the processes of the court is evidence tending to show guilt. *Collier v. Commonwealth,* Ky., 339 S.W.2d 167 (1960). The attempt does not have to be committed by the accused, but someone acting on his behalf. *Campbell, supra.*

There is more than a suggestion of a link among Appellant, his father, and his wife. At the time of the crime, his wife assisted in cleaning up the crime scene. She even approached Danny Bryant in the yard after the shooting and asked him to 'swear on your baby's life you'll never mention this again.' She was among the women that transported the murder weapons. She clearly was involved and assisted at all times surrounding the crime. Appellant resided with his parents the night following the murders and remained with them for several days. The jury could properly infer that it was on the behalf and behest of Appellant for his wife and father to intimidate Ronnie Dugger. Such conduct shows a consciousness of guilt.

The facts and surrounding circumstances here are certainly susceptible to the reasonable inference that Appellant's wife and father were acting on his behalf. In *U.S. v. Gatto,* 995 F.2d 449 (3rd Cir.1993), a government witness altered his testimony on cross-examination, in favor of the defendant when a spectator in the courtroom "looked unhap-py" at the witness. Thus, intimidation of the witness was inferred and the jury could consider such inference along with all other evidence.

## V. IT WAS NOT ERROR TO IMPEACH APPELLANT'S CHARACTER

 Appellant claims error in the admission of testimony about a specific act by Appellant intended to result in a false criminal accusation against his wife. Appellant cites KRE 608 as prohibitive of this evidence.

Appellant's cross-examination of his wife disclosed that she was in the midst of a child custody battle with his parents, and that there were pending charges against her. When Appellant was later cross-examined, he denied ever orchestrating any testimony against his wife. The Commonwealth moved to introduce the letter to Eugene Castene in which Appellant attempted to have his wife set up in a scheme to result in false criminal charges against her. Appellant objected to the letter solely on the ground that it was not provided in discovery. He did not offer a KRE 608 objection.

KRE 404 allows evidence of prior bad acts. KRE 404 provides:

**Rule 404. Character evidence and evidence of other crimes.**—(a) Character evidence generally. Evidence of a person's character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

(1) Character of accused. Evidence of pertinent trait of character or of general moral character offered by an accused, or by the prosecution to rebut the same;

Appellant opened the door for impeachment of his character under KRE 404 by affirmatively stating that he never orchestrated testimony. The testimony regarding Appellant's attempt to create a scenario which would result in false criminal charges brought against his wife became relevant once Appellant denied any such attempt.

KRE 611 provides that a witness may be cross-examined on any matter relevant to any issue in a case, including credibility.

Therefore, KRE 611 embodies the 'wide open' rule of cross-examination by allowing questioning as to any matter *relevant* to any issue in the case, subject to judicial discretion in the control of interrogation of witnesses and production of evidence.

*Derossett v. Commonwealth*, Ky., 867 S.W.2d 195, 198 (1993); (emphasis original).

 No error occurred in the admission of this evidence. Moreover no prejudice occurred. Weighing the relevancy against the prejudice is peculiarly within the province of the trial court. *Phillips v. Commonwealth*, Ky., 679 S.W.2d 235 (1984). *United States v. Degaglia*, 913 F.2d 372 (7th Cir. 1990). The trial court did not abuse its discretion. The jury was already well aware of Appellant's bad character. Witnesses had previously testified that he had concocted a scheme to shift the blame for the Vaughn brothers' killing to the Collins family. The jury also heard testimony through Appellant and Aaron Caldwell regarding Appellant's idea to have Aaron Caldwell lie under oath and claim that he looked through a window of the house and saw Ronnie Dugger shoot Lynn. Any additional account of his attempt to falsify testimony did not prejudice Appellant. *United States v. McClain*, 934 F.2d 822 (7th Cir.1991); *United States v. Burke*, 948 F.2d 23 (1st Cir.1991). Any error was harmless in light of the overwhelming evidence of guilt.

## VI. INADVERTENT USE OF "RECOMMEND" ONCE IN PENALTY INSTRUCTION WAS HARMLESS ERROR

 It was not reversible error for the trial court to give penalty phase instructions that included the word "recommend" one time. The trial court did use the word "recommend" in an isolated instance in the penalty phase instructions, however no objection was made at trial on this basis. Hence, like the other allegations of error about the instructions, this allegation was not preserved as required by RCr 9.54(2).

The penalty phase instructions consist of 14 pages. The word "recommend" was used one time in instruction number three, which stated, "If upon the whole case you have a reasonable doubt whether the defendant should be sentenced to death, you shall *recommend* a sentence of imprisonment instead." The word "fix", "fixed", or "fixing" was used no less than twenty (20) times in the instructions. *Bussell v. Commonwealth*, Ky., 882 S.W.2d 111, 113–14 (1994), is dispositive of this issue. In *Bussell*, this Court held it was not reversible error for the trial judge to use the word "recommend" in two isolated instances in the penalty phase instructions and the word "fix" at least five times. *See also, Grooms v. Commonwealth*, Ky., 756 S.W.2d 131 (1988); *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665 (1990); *Tamme v. Commonwealth*, Ky., 759 S.W.2d 51 (1988); and KRS 532.025. As in *Bussell* there was no reversible error.

## VII. IMPERFECT VERDICT FORMS DO NOT REQUIRE REVERSAL

 Appellant complains that the verdict forms given by the trial court provided the jury a space to specify the aggravating circumstances. Appellant contends that because of the forms used, there is no way to find an aggravating circumstance without fixing an aggravated penalty, in this case death. Appellant concedes that this issue is not preserved.

The verdict forms pertaining to a sentence of life imprisonment without the possibility of parole for 25 years were exactly the same as other forms except for the sentence specified. The instructions informed the jury that sentences of death were authorized and made it clear that the jury need only find an aggravating circumstance for that sentence or a sentence of life imprisonment without the possibility of probation or parole for twenty-five years.

The verdict forms in this case conform to Cooper's, *Kentucky Instructions to Juries*, Sec. 12.10 (1993). The verdict form at issue has been used in numerous cases and does not constitute substantial error.

The jury in this case convicted Appellant and sentenced him to death. The penalty

phase instructions required the jury to find evidence of the aggravating factor beyond a reasonable doubt. The instruction on mitigating circumstances permits the jury to consider any mitigating circumstance presented in the evidence, whether proven beyond a reasonable doubt or not.

In *Chumbler v. Commonwealth*, Ky., 905 S.W.2d 488, 497–98 (1995), the verdict form used did not constitute reversible error. *Chumbler* was not a death penalty case and *Chumbler* did not overrule *Wilson v. Commonwealth*, Ky., 836 S.W.2d 872 (1992), a death penalty case. In *Wilson*, this Court said,

> Wilson's complaint about format of the capital sentencing verdict forms is without merit. A review of the verdict forms and the potential interpretation the jurors gave them involves consideration of the instructions they were given. The inquiry we make involves what a "reasonable juror" would understand the charge to mean. *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). The specific instructions given to the jury regarding aggravating circumstances were clear. The Wilson jury was properly instructed that the finding of an aggravating circumstance did not require imposition of the death penalty. *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672 (1985).

*Id.* at 892.

Even if Appellant's argument otherwise had merit, the jury in this case clearly was not disposed to impose a lesser sentence, or it would have imposed a sentence of life imprisonment without the possibility of probation or parole for 25 years. The instructions properly made the jury aware of its option to impose a sentence of less than death. No error occurred. *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672, 679 (1985); *Skaggs v. Commonwealth*, Ky., 803 S.W.2d 573, 575 (1990). Appellant was not prejudiced by any imperfection in the verdict form.

## VIII. IT WAS PROPERLY WITHIN THE TRIAL COURT'S DISCRETION TO REFUSE TO ACCEPT PERSHING HAYES AS AN EXPERT

█ Finally, Appellant argues that the court committed prejudicial error by not allowing Pershing Hayes to testify as an expert on firearms. Hayes was a friend of Appellant's who had worked with firearms his entire life and knew the mechanics of several types of guns. He gave testimony on the necessary trajectory of the bullets in order to create the holes in the wall at the murder scene. His testimony implied that Appellant could not have fired at Lynn. The court did not accept Pershing Hayes as an expert because of lack of training. However, Hayes was allowed to testify, although not as an expert, and the jury was aware of his extensive experience and knowledge of firearms.

*Lee v. Butler*, Ky.App., 605 S.W.2d 20 (1979), holds that expert status is determined at the discretion of the trial judge. The testimony also must be relevant to the task at hand which involved ballistics. Pershing Hayes was in no way an expert and the trial court's determination of such was proper.

## IX. PROPORTIONALITY

█ The Commonwealth, through its death penalty statutes, has established a proportionality review process. KRS 532.075(3)(c). Under KRS 532.075(1), "[w]henever the death penalty is imposed for a capital offense ... the sentence shall be reviewed on the record by the Supreme Court." Further, Subsection (3)(c) provides that "with regard to the sentence, the court shall determine ... [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

█ Appellant argues that the proportionality process is unconstitutional in that it denies him due process of law. We disagree. Pursuant to KRS 532.075, we have made a careful review of the record and have determined that the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. The death sentence was not disproportionate to the penalty imposed in similar sentences since 1970 considering both the crimes and the defendant. Those cases have been previ-

ously recited by this Court most recently in *Simmons v. Commonwealth*, Ky., 746 S.W.2d 393 (1988). That list is incorporated herein by reference and our review in this case is in accordance with KRS 532.075(5). In addition we have also considered the decisions in *Moore v. Commonwealth*, Ky., 771 S.W.2d 34 (1988); *Epperson and Hodge v. Commonwealth*, Ky., 809 S.W.2d 835 (1990); *Taylor v. Commonwealth*, Ky., 821 S.W.2d 72 (1990), and *Wilson v. Commonwealth*, Ky., 836 S.W.2d 872 (1992). We have conducted an independent review of all the circumstances and conclude that they exceed any minimum justifying capital punishment.

The death sentence imposed on Appellant was not inappropriate, arbitrary, discriminatory, unusual or disproportionate. The sentences were imposed because he was found guilty of the intentional murders of two individuals. The guilt was obvious and the depravity pronounced.

■ We have considered Appellant's other arguments against the Kentucky death penalty and find them to be without merit. Its application cannot be considered arbitrary in view of the guidelines for its imposition as provided by KRS 532.035 and 532.075. As the United States Supreme Court has noted, juries consider individual defendants and individual cases when fixing a death sentence, and such statistical correlation of evidence is insufficient to invalidate a jury's specific finding. *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Furthermore, death by electrocution is not cruel and unusual punishment. *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 683 (1990).

We have reviewed the issues presented by Appellant and conclude that there was no error of sufficient gravity to warrant reversal of his conviction. As such, the judgments and sentences of death are affirmed.

BAKER, GRAVES, LAMBERT, and WINTERSHEIMER, JJ., concur.

STUMBO, J., dissents in a separate opinion in which STEPHENS, C.J., joins.

KING, J., joins the separate dissenting opinion as to sections I and II.

STUMBO, Justice, dissenting.

Reluctantly, I must dissent. My disagreement with the majority opinion lies in four areas: venue, jury qualification, instructions, and use of rebuttal evidence.

## I. VENUE

The trial court erred when it failed to grant a change of venue in this case. Of the ninety-eight prospective jurors called, only six knew nothing of the case and one-third either believed Appellant was guilty or did not presume him to be innocent. Eighteen of those excused from service for cause had an opinion as to guilt, seventeen were unable to give Appellant the presumption of innocence, and six had too much knowledge of the case to sit. Nine others had a bias toward the Commonwealth or police due to relationships with the victims, seven did not believe in the death penalty, one would vote only for the death penalty, and five others were excused for miscellaneous other reasons. The jury was finally selected from a group of thirty-five. Of that group, only two had never before heard of Appellant or the crimes charged.

When the composition of the final jury panel is considered with the evidence of widespread and prejudicial publicity over the prior two years, it is clear that a fair trial in Laurel County was impossible. Newspaper coverage between August of 1991 and the trial date was comprehensive and repetitive. The details of the murders were repeated over and over, along with other information such as the fact that, but for deals with the government, Appellant would have been serving jail time for other crimes at the time these particular offenses occurred. Appellant was the subject of editorials in the local and regional newspapers. Even the majority opinion admits that these editorials contained remarks that were inflammatory. Other suspected crimes of Appellant were detailed in the articles and on television. The statements of witnesses at this crime scene were quoted as to the details of the slayings.

Due process requires a remedy for the effects of prejudicial pretrial publicity, in-

cluding but not limited to a change of venue, when "there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial...." *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600, 620 (1966). Here, the likelihood was beyond "reasonable," it was a certainty.

*Jacobs v. Commonwealth*, Ky., 870 S.W.2d 412, 417 (1994), tells us that in determining whether venue was properly determined, we may look not only at pretrial publicity, but at the *voir dire* examination of the jury. As in that case, the jury's "knowledge of the crime is evident, almost alarming. It is, however, the opinions evidenced by some jurors, and even that of the foreperson who was unsuccessfully challenged for cause. The totality of views are reflective of the taint which requires a change of venue." *Id.* The jury foreperson in this case not only was aware of Appellant's identity and the crime with which he was charged, but stated that he thought he would require Appellant to put on proof before he could find Appellant innocent. (Altogether, thirteen of the jury pool indicated that they would require proof of innocence rather than giving Appellant the presumption granted by the Constitution.) Another juror knew of this crime, as well as the septic tank murder, and stated that she thought Appellant was guilty, though she had heard only one side of the case. She was rehabilitated by stating that she could wipe her mind clean and consider only the evidence presented in court. Two other jurors who sat on the case stated that they knew the details of the crimes charged and had heard others in the community express the opinion that Appellant was guilty. One said he could not recall ever expressing such an opinion himself, but was not sure that he had not. The other stated that everything he had ever heard about Appellant was negative.

The venue problem presented by this case is virtually indistinguishable from the one found in *Jacobs v. Commonwealth, supra.* Appellant was denied his constitutional right to a fair trial.

## II. JURY QUALIFICATION

The majority opinion sets out in detail the *voir dire* testimony of the ten jurors whose qualifications Appellant challenges on appeal. Eight of the ten actually served as jurors and determined Appellant's fate. Each and every one of the ten knew who Appellant was, and knew of the crime charged. Six of those who served knew something of the other murders with which Appellant was charged. A careful reading of the record confirms what is only hinted at in the majority opinion, that extensive rehabilitation of most of these jurors was necessary in order to qualify them for service on this jury.

Juror A admitted that she knew others who thought Appellant guilty, and that she felt the same way, but could not make a definitive judgement until all of the evidence was presented. Juror B couldn't recall ever saying that Appellant was guilty of these crimes, but couldn't say for sure that he had not made such a statement. Alternative Juror D stated that most of the community believed Appellant was guilty, and that the evidence he had heard, and that fact that Appellant had been arrested, made him suspect Appellant was guilty. Juror E stated that the media coverage made him suspect Appellant. Juror G recalled that Appellant was an FBI informant, and stated that she was not sure that she could remove all information she had read of Appellant from her mind during the trial and deliberations.

Juror H knew of the charges against Appellant in regard to both the Vaughns and the other murders, as did Juror I. Both assured the trial court that they could put that knowledge out of their minds in sitting on this case. Not surprisingly, each of the challenged jurors made similar assurances to the trial court. "Later rehabilitation statements on impartiality should be given little weight." *Jacobs, supra* at 417.

Appellant used all of his peremptory challenges and had none left to strike these jurors. Though each of these potential jurors denied actual bias or prejudice, their knowledge of the media coverage and facts surrounding these and the other charges Appellant faced, and the attitudes expressed in their responses to *voir dire,* "such may be

implied or reasonably inferred." *Montgomery v. Commonwealth,* Ky., 819 S.W.2d 713, 717 (1991).

It makes no difference that the jurors claimed they could give the defendants a fair trial. As we held in *Pennington v. Commonwealth,* Ky., 316 S.W.2d 221, 224 (1958), "[i]t is the probability of bias or prejudice that is determinative in ruling on a challenge for cause;" and in *Tayloe v. Commonwealth,* Ky., 335 S.W.2d 556, 557 (1960), "the conditions were such that their connections would probably subconsciously affect their decision of the case adversely to the defendants"; and in *Marsch v. Commonwealth,* [ (Ky.) ] *supra,* 743 S.W.2d [830] at 834, [ (1987) ] "their statements, given in response to leading questions, that they would disregard all previous information, opinions and relationships should not have been taken at face value." *Pennington, Tayloe,* and *Marsch* stand for the principle that objective bias renders a juror legally partial, despite his claim of impartiality.

*Montgomery, supra* at 718.

### III. INSTRUCTIONS

This court has clearly and definitively spoken on the question of whether it is proper to use the word "recommend" when instructing the jury on its responsibility in sentencing. In *Tamme v. Commonwealth,* Ky., 759 S.W.2d 51, 53 (1988), we said "in capital cases in which trial commences after the effective date of the finality of this opinion, the word 'recommend' may not be used with reference to a jury's sentencing responsibilities in voir dire, instructions or closing argument."

The instruction given herein directed the jury as follows:

If you have a reasonable doubt as to the truth or existence of any aggravating circumstance listed in Instruction No. 5 or in Instruction No. 7, you shall not make a finding with respect to it.

If upon the whole case you have a reasonable doubt whether the defendant

should be sentenced to death, you shall recommend a sentence of imprisonment.

Clearly and unequivocally, the mandate of *Tamme* was violated. This is grounds for reversal.

### IV. REBUTTAL EVIDENCE

The trial court erred when it permitted, over defense objection, presentation of evidence that Appellant's wife and father were arrested for intimidation of a witness, Ronnie Dugger, against Appellant. This evidence was revealed during re-direct examination of Appellant's wife and Dugger after cross-examination elicited the fact that both were subject to pending charges when they took the stand. The trial court ruled that Appellant had opened the door to the evidence by inquiring about the pending charges his wife faced. In testifying about her own charge, Mrs. Foley also informed the jury that Appellant's father had a similar charge. Dugger testified that he was promised probation on a marijuana charge if he testified against Appellant.

It is a rule of longstanding in this jurisdiction that evidence that a witness has been threatened or otherwise influenced in an attempt to suppress his testimony is admissible in a criminal prosecution only where the threat was made by, or on behalf of, the accused.

*Campbell v. Commonwealth,* Ky., 564 S.W.2d 528, 531 (1978).

There is absolutely no evidence that these threats were made on behalf of Appellant. The majority cites as authority for allowing the admission of this evidence, *United States v. Gatto,* 995 F.2d 449 (3rd Cir.1993). Therein, the court allowed admission of evidence that a spectator had "looked unhappy" at a witness during cross-examination, thereby causing the witness to alter his testimony. *Id.* at 451, 456–57. A third circuit case is not binding authority upon this Court. Additionally, this Court has spoken definitively in *Campbell.* We require a showing that the threat was made on behalf of the accused,

not evidence raising an inference that this is true. *Campbell, supra.* That an act was done which might be to Appellant's benefit is not proof that the act was performed at appellant's behest. The evidence was inadmissible.

For the reasons set forth herein, I would reverse the conviction and remand for a new trial.

STEPHENS, C.J., joins this dissenting opinion.

KING, J., joins sections I and II of this dissenting opinion.